UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DISTRICT COUNCIL 16 NORTHERN CALIFORNIA HEALTH AND WELFARE TRUST FUND, et al., | Case No. 20-cv-02863-JCS |
| Plaintiffs, | **ORDER REGARDING MOTION TO DISMISS THIRD-PARTY COMPLAINT** |
| v. | Re: Dkt. No. 43 |
| HULSEY CONTRACTING INC., | |
| Defendant. | |

## I.  INTRODUCTION

Third-Party Plaintiffs Hulsey Contracting Inc. and Roberto Hulsey (collectively "HCI")

bring a third-party complaint asserting a fraud claim under California state law against Third-Party

Defendants District Council No. 16 of the International Union of Painters and Allied Trades (the

"Union") and Jeffrey B. Roberts.  Third-Party Defendants now move to dismiss HCI's claim for

lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure and

for failure to state a claim under Rule 12(b)(6).  For the reasons discussed below, Third-Party

Defendants' motion is GRANTED, and HCI's fraud claim is DISMISSED without leave to amend

in this Court, but without prejudice.[1]

## II.  BACKGROUND

### A.  Procedural History

This case was initially filed by union benefit trust funds seeking to collect payments which

HCI is alleged to have failed to make to the Union's trust fund in violation of the Employee

Retirement Income Security Act ("ERISA") section 515, 29 U.S.C. § 1145, and section 301(a) of

---

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

the Labor Management Relations Act ("LMRA"). *See* Compl. (dkt. 1) ¶ 13. In its answer to the first amended complaint, HCI pleaded an affirmative defense of "Fraud in the Execution" containing allegations which HCI repeats here as the basis of the third-party complaint. *See* Answer to 1st Am. Compl. (dkt. 35) at 9.

### B. Factual Allegations of the Third-Party Complaint

Because a plaintiff's factual allegations are generally taken as true on a motion under Rule 12(b)(6) or a facial challenge to subject matter jurisdiction under Rule 12(b)(1), this section summarizes the allegations of HCI's third-party complaint as if true. Nothing in this order should be construed as resolving any issue of fact that might be disputed at a later stage of the case.

Roberto Hulsey is the president of HCI, a California corporation primarily in the business of installing polyurethane foam insulation on wine storage tanks. *See* Third-Party Compl. ("TPC," dkt. 43) ¶¶ 8–10. Prior to HCI's interactions with the Union alleged in the third-party complaint, HCI had no business dealings with unions nor were any of its employees represented by a union. *Id*. ¶ 9.

On or about June 9th, 2017, HCI became interested in participating in lead abatement projects conducted by Pacific Gas and Electric ("PG&E") at California facilities associated with Airgas, LLC. *Id*. ¶ 11. HCI understood that its employees' participation in the project required HCI to associate with a union. *Id*. In the interest of forming such an association, a HCI supervisor and Mr. Hulsey telephoned the Local 294 chapter of the Painters Union of Northern California. *Id*. ¶¶ 12–13. During this initial phone call, Mr. Roberts—a business representative for the Union—confirmed that the Union would be able to associate with HCI for the purposes of HCI's working on the PG&E/Airgas projects. *Id*. ¶ 14. The parties scheduled an in-person meeting for June 14, 2017. *Id*.

At the June 14th meeting, Mr. Hulsey signed a post-card sized document entitled "Agreement of Employers Regarding Bay Area Painters and Tapers Trust Funds," which Mr. Hulsey understood as an agreement to contribute to the Union's trust funds. *Id*. ¶ 16. The Union did not execute the document, but it gave Mr. Hulsey a copy of it. *Id*. At a meeting on or about September 1, 2017, Mr. Roberts presented HCI with two additional documents which Mr. Roberts

described as "Addendums" that HCI needed to sign in order to work on PG&E/Airgas projects in Northern California. *Id*. ¶ 18. HCI signed both "Addendums." *Id*. The Union did not send HCI any additional documents. *Id*.

During HCI's initial phone call with Mr. Roberts and at each of their subsequent meetings, HCI told Mr. Roberts that all HCI employees not working on the PG&E/Airgas projects must remain non-union. *Id*. ¶¶ 14–16. HCI told Mr. Roberts that HCI's association with the Union had to be contingent upon this arrangement, and Mr. Roberts repeatedly confirmed that this was the agreement into which HCI and the Union were entering. *Id*. The Union never presented HCI or Mr. Hulsey a Collective Bargaining Agreement, a Master Agreement, or a Trust Agreement for signature. *Id*. ¶ 17.

HCI employees unanimously voted against representation by the Union during the summer of 2017. *Id*. ¶ 19. However, one HCI employee—a supervisor named Shawn Peddy—joined the Union, per the requirements HCI understood itself to be subject in order for its employees to work on the PG&E/Airgas projects. *Id*. Starting in June 2017, HCI made trust-fund contributions for work on the PG&E/Airgas jobs in accordance with its understanding of the agreement with the Union, totaling approximately $100,000 by the end of 2018. *Id*. ¶ 21.

In January 2019, HCI ended its association with the Union with respect to HCI's participation on PG&E/Airgas projects, and HCI stopped bidding to participate on such projects. *Id*. Three to six months later, the Union, with HCI's cooperation, audited HCI. *Id*. ¶ 22. In the spring of 2020, the Union's trust fund sent HCI an invoice for over $2,000,000 in trust fund contributions on the premise that HCI's contributions should cover HCI's entire payroll. *Id*. ¶ 24. The trust fund also filed suit pursuant to this invoice. *Id*.

HCI asserts a claim under California state law for intentional fraud "in violation of the Union's prior oral agreement with HCI." *Id*. HCI and Mr. Hulsey seek compensatory and punitive relief "in excess of $75,000" and costs and fees. *See id*. at 7–8, ¶¶ (a)–(c) (Prayer for Relief).

**C.    The Parties' Arguments**

Third-Party Defendants move to dismiss HCI's fraud complaint on several bases. *See*

3

*generally* Mot. (dkt. 54). Third-Party Defendants argue: (1) HCI's complaint should be dismissed for failure to set forth a cognizable legal theory, *id*. at 5; (2) the Court lacks subject matter jurisdiction over HCI's claim if the claim is interpreted as disputing the existence of a contract between the Union and HCI, *id*. at 5–7; (3) the Court lacks subject matter jurisdiction if the fraud claim is interpreted as arising under LMRA section 301 federal common law, *id*. at 7–8; (4) if interpreted as a state-law fraud claim, the complaint should be dismissed as preempted by section 301 of the LMRA, *id*. at 8–11; (5) HCI's complaint seeks indemnification from the Union as relief, and there is no cognizable legal theory under which such relief can be granted, *id*. at 11; (6) the Court does not have subject matter jurisdiction because the complaint's allegation of fraud is preempted by the National Labor Relations Act ("NLRA"), requiring HCI to seek relief from the National Labor Relations Board ("NLRB"), *id*. at 12–13; and (7) the complaint is improperly pleaded because it names Mr. Roberts as a third-party defendant, and section 301 of the LMRA exempts Mr. Roberts from individual liability arising from contract violations between a union and an employer, *id*. at 13.

HCI argues in response that the complaint sets forth a cognizable legal theory under California state law. Opp'n (dkt. 56) at 7–9. HCI further contends that subject matter jurisdiction is appropriate on supplemental jurisdiction grounds, and that the complaint does not dispute the existence of a contract between the Union and HCI, nor does the complaint allege a federal common law tort under section 301. *Id*. HCI's opposition brief clarifies that HCI here reproduces the fraud allegations asserted as an affirmative defense to the first amended complaint and that, in the third-party complaint, HCI pleads the elements of California common law fraud. *Id*. at 8, *see* TPC ¶¶ 25–30.

Third-Party Defendants' first preemption theory is that HCI's state-law fraud claim is preempted by section 301 of the LMRA, which grants exclusive federal jurisdiction over violation-of-contract suits between employers and labor organizations. Mot. at 8. Third-Party Defendants contend that the allegations made against them arise out of a contract dispute with HCI—specifically, a dispute about the scope of a contract—thus the preemptive effects of section 301 apply to HCI's fraud claim. Mot. at 10–11. Third-Party Defendants further argue that the

applicable legal standard is that section 301 will preempt any state-law cause of action if any element of the state-law claim is resolvable only by interpreting the contract. *Id.* HCI argues that its state-law claim is not preempted by section 301 because the Union did not represent its employees, nor did HCI sign a collective bargaining agreement with the Union. Opp'n at 11–14. HCI notes that the Ninth Circuit previously found that section 301 did not preempt a state-law fraud claim brought against a union representative by an employer. *See id.* at 13 (citing *Operating Eng'r's Pension Trust v. Wilson*, 915 F.2d 535 (9th Cir. 1990)). In their reply, Third-Party Defendants distinguish *Wilson* on the basis that here, HCI sought out the Union for the purpose of securing representation for its employees. *See* Reply (dkt. 57) at 1–2.

Third-Party Defendants also argue that HCI's state-law fraud claim is preempted by the doctrine announced in *Garmon* and therefore the proper venue for the resolution of HCI's claim is the NLRB. Mot. at 12–13 (citing *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959)). As with the first preemption theory, HCI contends that Third-Party Defendants' argument is premised upon the existence of a bargaining relationship between HCI and the Union, which HCI claims never existed. Opp'n at 15. Third-Party Defendants argue in response that the arrangement between the Union and HCI constituted a "pre-hire agreement" authorized by section 8(f) of the NLRA, thus making the Union's alleged misrepresentation an unfair labor practice properly adjudicated by the NLRB. *See* Reply at 4–5.

Next, HCI argues that the third-party complaint does not assert any legal right to indemnification, and that its prayer for relief contains a standard request for damages in state-law intentional fraud suits. Opp'n at 14. HCI further clarifies that its complaint does not request the Union to pay or contribute to trust fund payments owed by HCI. *Id.* Third-Party Defendants respond that HCI's request for damages arising out of "indebtedness for trust claims" is indistinguishable from HCI seeking indemnification from Third-Party Defendants. Reply at 3–4.

Finally, HCI argues that Mr. Roberts is not immune from suit because 29 U.S.C. § 185(b) only precludes judgments that are enforceable against a union from being enforced against an individual member of that union. Opp'n at 15–16. HCI contends that its complaint sets forth a theory of common law tort liability against Mr. Roberts individually, from which he enjoys no

exemption or immunity.  *Id.*  Third-Party Defendants respond that Mr. Roberts's inclusion in the suit is functionally unnecessary because HCI cannot hold him responsible for paying monetary relief for his actions representing the Union.  Reply at 6.

## III.    ANALYSIS

### A.    Legal Standard

A complaint may be dismissed for failure to state a claim on which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint."  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a claimant's burden at the pleading stage is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party."  *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A pleading must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Rather, the claim must be "'plausible on its face,'" meaning that the claimant must plead sufficient factual allegations to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting

6

*Twombly*, 550 U.S. at 570).

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a district court must dismiss an action if it lacks jurisdiction over the subject matter of the suit. *See* Fed. R. Civ. P. 12(b)(1). "Subject matter jurisdiction can never be forfeited or waived and federal courts have a continuing independent obligation to determine whether subject-matter jurisdiction exists." *Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 975 n.12 (9th Cir. 2012) (internal quotation marks and citations omitted). A plaintiff's standing under Article III of the United States Constitution is a component of subject matter jurisdiction properly challenged under Rule 12(b)(1). *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). On a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), it is the plaintiff's burden to establish the existence of subject matter jurisdiction. *Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008). A party challenging the court's subject matter jurisdiction under Rule 12(b)(1) may bring a facial challenge or a factual challenge. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In evaluating a facial challenge to subject matter jurisdiction, the court accepts the factual allegations in the complaint as true. *See Miranda v. Reno*, 238 F.3d 1156, 1157 n.1 (9th Cir. 2001).

## B.   *Garmon* Preemption

Third-Party Defendants argue that the Court lacks jurisdiction over HCI's claim because the claim is preempted under the doctrine announced in *Garmon*. Mot. at 12–13. *Garmon* provides that "when an activity is arguably subject to sections 7 or 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted." *Garmon*, 359 U.S. at 245. The Supreme Court offered the following elaboration on this broad standard: "a party asserting [*Garmon*] preemption must advance an interpretation of the [NLRA] that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts or the board." *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 395 (1986) (quoting *Marine Engineers Beneficial Ass'n v. Interlake S. S. Co.*, 370 U.S. 173, 184 (1962)). While this standard of preempting claims even "arguably" within the NLRB's jurisdiction leaves a potential gap between conduct that may be

United States District Court
Northern District of California

regulated by state law and conduct for which the NLRB in fact assumes jurisdiction, the Supreme

Court held that the "[t]he withdrawal of this narrow area from possible state activity follows from"

existing precedent, and "[t]he governing consideration is that to allow the States to control

activities that are potentially subject to federal regulation involves too great a danger of conflict

with national labor policy." *Garmon*, 359 U.S. at 246. "It is now settled law that *Garmon*

preemption is a jurisdictional doctrine based on the presumed intent of Congress that the NLRB

should generally exercise jurisdiction over cases falling within sections 7 and 8 of the NLRA."

*Ethridge v. Harbor House Rest.*, 861 F.2d 1389, 1398 (9th Cir. 1988). *See also Textron Lycoming*

*Reciprocating Engine Div., Avco Corp. v. United Auto. Workers of Am., Int'l Union*, 523 U.S. 653,

662 (1998) (Stevens, J., concurring) (reasoning that broad preemption is appropriate because "the

[NLRB] undoubtedly has more expertise in the collective-bargaining area than federal judges").

    As an element of its fraud claim, HCI alleges that Third-Party Defendants misrepresented

their "contractual intentions" during their discussions with HCI regarding the amount HCI would

have to contribute in trust fund payments. *See* TPC ¶¶ 26–27. Third-Party Defendants argue that

such a misrepresentation, if it occurred, would amount to bargaining in bad faith for a pre-hire

agreement, violating section 8(b)(3) of the NLRA, and therefore bringing HCI's complaint within

the special jurisdiction of the NLRB. Mot. at 12 (citing 29 U.S.C. §158(b)). Third-Party

Defendants thus proffer an interpretation with two distinct components requiring adjudication:

(1) the characterization of the arrangement between the Union and HCI as a "pre-hire agreement";

and (2) the contention that pre-hire agreements are recognized bargaining relationships subject to

section 8(b)(3) good-faith bargaining requirements. Mot. at 12–13. The question before the Court

is not whether the contract was in fact a pre-hire agreement or whether bad-faith negotiation of

such agreements definitively falls within the purview of the NLRB. Under *Garmon*, HCI's claims

are preempted if they *arguably* fall within the NLRB's exclusive jurisdiction. *Garmon*, 359 U.S.

at 245. This standard is met here because Third-Party Defendants' interpretation is not plainly

contrary to the language of the NLRA, nor has such an interpretation been authoritatively rejected.

*See Int'l Longshoremen's*, 476 U.S. at 395.

    Third-Party Defendants' characterization of the arrangement between HCI and the Union

as a pre-hire agreement has not been authoritatively rejected, nor is such an interpretation plainly

contrary to the language of the NLRA.  In its opposition brief, HCI disputes that it engaged in

bargaining and negotiations pursuant to a pre-hire agreement with the Union.  Opp'n at 15.  A

"pre-hire agreement" is a type of collective bargaining agreement permitted in construction-

industry contexts under section 8(f) of the NLRA.  29 U.S.C. §158(f).  Pre-hire agreements set

"the terms and conditions of employment for workers hired by the signatory employer without the

union's majority status first having been established." *Jim McNeff, Inc. v. Todd*, 461 U.S. 260,

260 (1983).  As the D.C. Circuit explained in a decision cited by Third-Party Defendants, "[u]nder

such an agreement, the business and union agree in advance that a particular union will represent

employees, and they may even negotiate the initial terms and conditions of employment directly

between themselves.  That can all occur without any vote by the employees, or even before a

single employee is hired." *Colo. Fire Sprinkler, Inc. v. NLRB*, 891 F.3d 1031, 1035 (D.C. Cir.

2018).

Here, HCI telephoned the Union to ask whether some of HCI's workers on a particular

project could associate with the Union.  TPC ¶ 13.  At a subsequent meeting, Mr. Roberts and Mr.

Hulsey agreed that Mr. Hulsey would sign a document entitled "Agreement of Employers

Regarding Bay Area Paints and Tapers Trust Funds" according to which "HCI agreed to

contribute to the [Union's] trust funds" as part of HCI employees' union association.  *Id.* at ¶ 16.

Finally, on or about September 1, 2017, HCI signed two additional "Addendums" at Mr. Roberts's

prompting.  *Id.* at ¶ 18.  Nevertheless, HCI asserts in the span of two paragraphs of its opposition

brief that "there was no established bargaining relationship," "there was no bargaining ongoing,"

and that the Union's misrepresentations occurred "in the absence of a recognized bargaining

relationship."  Opp'n at 15.  HCI relies on the proposition that a "union cannot compel an

employer to bargain for employees the union does not represent" to support its conclusion that no

such bargaining took place.  *Id*. (citing *United Food Com. Workers Union v. Alpha Beta Co.*, 736

F.2d 1371, 1377 (9th Cir. 1984)).  However, HCI was not compelled by the Union to engage in

any bargaining.  It is undisputed that HCI sought out a relationship with the Union to form an

agreement pursuant to an association; whatever the status of this agreement, HCI does not allege

9

facts suggesting that the Union compelled HCI to enter a bargaining relationship.

In *Wilson*, which HCI relies on as authority, the Ninth Circuit rejected a characterization of a signed agreement between an employer and union representative as a pre-hire agreement. *Wilson*, 915 F.2d at 540. The Court reasoned from the fact that the union representative presented the agreement to the employer as an owner-operator agreement permitting the employer to continue operating his own equipment on a jobsite, not as a pre-hire contract concerning the employer's employees. *Id*. Unbeknownst the *Wilson* employer, the agreement also obligated him to pay his employees union wages and contribute trust-fund payments to the Union's trust on their behalf. *Id*. at 536. Here, unlike the employer in *Wilson*, HCI knew that its agreement with the Union would require some of its employees to join the Union and obligate HCI to make trust fund payments. TPC at ¶¶ 12–13. Both the protracted nature of the negotiations and HCI and the Union's mutual intent to associate—even if only for certain projects—warrants the conclusion that *Wilson* does not stand for an authoritative rejection of Third-Party Defendants' characterization of its agreement with HCI as a pre-hire agreement. *Cf. S. Cal. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc.*, 359 F.3d 1127, 1132 (9th Cir. 2004) (holding that a prehire agreement may be adopted by conduct alone in the absence of a written agreement).

Furthermore, the text of section 8(f) specifically regulates bargaining relationships between construction-industry employers and labor organizations without "majority status," between which there is no prior collective bargaining agreement. 29 U.S.C. §158(f). Here, the Union did not have majority status at HCI, but at least one HCI employee would be represented by the Union pursuant to the Union's agreement with HCI. TPC at ¶ 19. Thus, while this bargaining relationship may be at the outer limits of what falls under section 8(f), characterizing the agreement between the Union and HCI as a "pre-hire agreement" is not plainly contrary to the text of the statute.

As to the second component of the proffered interpretation: if the contractual arrangement between the Union and HCI constituted a "pre-hire agreement," then the Union's alleged misrepresentation of the effects of the agreement arguably violated section 8(b)(3)'s good-faith bargaining requirements. In *Wilson*, the Ninth Circuit implied that pre-hire agreements count as

"recognized bargaining relationships" subject to section 8(b)(3) requirements, even though it

declined to find a pre-hire agreement between the parties:

> Local 12 did not represent a majority of the Wilsons' employees; nor, as noted above, is there support for finding that the agreement as a pre-hire contract permitting Local 12 to bargain for the employees in the absence of majority support. In the absence of a recognized bargaining relationship, Kinsey's misrepresentation to Wilson at the jobsite is not arguably a violation of section 8(b)(3).

*Wilson*, 915 F.2d at 540 (internal citations omitted). Conversely, because there is support for

finding a pre-hire contract in the instant case, the Union's alleged misrepresentation to HCI is

arguably a violation of section 8(b)(3) because "[g]ood-faith bargaining necessarily requires that

claims made by either bargainer should be honest claims." *NLRB v. Truitt Manufacturing Co.*,

351 U.S. 149, 152 (1956). *Cf. Bricklayers Local No. 3*, 162 NLRB 476, 479 (1966) (leaving open

"the scope of bargaining obligations under Section 8(f)"). *See also Sheet Metal Workers Pension*

*Tr. of N. Cal. v. Bay Area HVAC, Inc.*, No. 19-CV-07976-VC, 2020 WL 2790524, at *1 (N.D.

Cal. May 30, 2020) (holding that arguments in favor of NLRB jurisdiction over alleged section

8(b)(3) violations in pre-hire agreement contexts have not been authoritatively rejected).[2]

HCI's claim for fraud is therefore preempted in accordance with the *Garmon* doctrine and

is DISMISSED for lack of subject matter jurisdiction.

Because Third-Party Defendants advance a preemption theory that provides sufficient

grounds for dismissal, the Court does not reach the arguments in the motion to dismiss concerning

section 301 preemption, the propriety of naming Mr. Roberts as a third-party defendant, or HCI's

---

[2] As Judge Chhabria explained in *Sheet Metal Workers*, even as he held in favor of *Garmon* preemption based on at least arguable NLRB jurisdiction:

> the arguments against NLRB jurisdiction are substantial, not least because the [NLRA] addresses only collective bargaining "subject to the provisions of section 159(a)"—meaning between the employer and a union that represents a majority of the employees. The Board has carved out an exception to this general rule for collective bargaining during the terms of a Section 8(f) pre-hire contract, but the Board hasn't extended Section 8(b)(3) to negotiations for the initial pre-hire contract or negotiations after the contract expires.

*Sheet Metal Workers*, 2020 WL 2790524 at *1 (citing *John Deklewa & Sons*, 282 NLRB 1375, 1386–87 & n.49 (1987)).

request for relief.

**IV.    CONCLUSION**

For the reasons discussed above, Third-Party Defendants' motion to dismiss HCI's fraud claim is GRANTED.  HCI's fraud claim is DISMISSED without leave to amend in this Court, but without prejudice to HCI pursuing a claim based on the same facts before the NLRB.  This dismissal is also without prejudice to any affirmative defense that HCI may have to Plaintiffs' claims against it.  *See Sheet Metal Workers*, 2020 WL 2790524, at * 2 ("Of course, Bay Area HVAC may raise contract invalidity as a defense to the trust funds' claims, an issue for which the allegations of misrepresentations by Local 104 are presumably relevant.").

**IT IS SO ORDERED.**

Dated: July 2, 2021

_____
JOSEPH C. SPERO
Chief Magistrate Judge