UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DISTRICT COUNCIL 16 NORTHERN
CALIFORNIA HEALTH AND WELFARE
TRUST FUND, et al.,

          Plaintiffs,

    v.

HULSEY CONTRACTING INC., et al.,

          Defendants.

Case No.  20-cv-02863-JCS

**ORDER GRANTING PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT AND DENYING
DEFENDANT ROBERTO HULSEY'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT**

Re: Dkt. Nos. 110, 111

## I.    INTRODUCTION

This is an action brought by several trust funds associated with District Council No. 16 of the International Union of Painters and Allied Trades (the "Union")[1] against Hulsey Contracting Inc. ("HCI") and Roberto Hulsey, as an individual, to recover unpaid fringe benefit contributions and related amounts under the Employee Retirement Income Security Act ("ERISA") section 515, 29 U.S.C. § 1145, and section 301(a) of the Labor Management Relations Act ("LMRA").  FAC ¶ 19.  Presently before the Court are cross motions for summary judgment.  In particular, Plaintiffs bring a Motion for Summary Judgment or in the Alternative Summary Adjudication ("Plaintiffs' Motion") asking the Court to enter judgment against HCI and Hulsey on their claim for delinquent contributions and related amounts, including auditing costs, liquidated damages, interest and attorneys' fees and costs.  Defendants oppose Plaintiffs' Motion and Defendant Roberto Hulsey

---

[1] The trust funds (collectively, "Trust Funds") are: 1) The District Council 16 Northern California Health and Welfare Trust Fund ("Health Fund"); 2) Bay Area Painters and Tapers Pension Trust Fund, including the Bay Area Painters and Tapers Pension Trust Fund Annuity Plan (together "Pension Funds"); and 3) District Council 16 Northern California Journeyman and Apprentice Training Trust Fund ("Apprentice Fund").  *See* First Am. Compl. ("FAC") (dkt. 1) ¶ 1.  The FAC also names as plaintiffs the following trustees of the Trust Funds: Robert Williams, John Maggiore and Jeannie Simpelo.

brings a Motion for Partial Summary Judgment ("Hulsey Motion") asking the Court to hold, as a matter of law, that he is not individually liable for any of the amounts sought by Plaintiffs.  A hearing on the Motion was held on October 6, 2023.  For the reasons set forth below, Plaintiffs' Motion is GRANTED and the Hulsey Motion is DENIED.[2]

## II.  BACKGROUND

### A.  Factual Background[3]

#### 1.  History of HCI and Circumstances Related to HCI Entering into Collective Bargaining Agreements

HCI commenced operations in January 2012, Declaration of Matthew Minser in Support of Plaintiffs' Motion for Summary Judgment (dkt. no. 110-7) ("Minser Decl."), Ex. X (Hulsey Dep. Vol. 1) at 15, though Hulsey states in his declaration that the business has been operating "in one form or another for approximately 30 years."  Declaration of Defendant Roberto Hulsey In Support of Motion for Partial Summary Judgment (dkt. no. 111-2) ("Hulsey Decl.") ¶ 4.  Roberto Hulsey has been president of HCI since at least January 2012. Minser Decl., Ex. X (Hulsey Dep. Vol. 1) at 15.  According to Hulsey, HCI is privately held and he is the sole owner of the company.  *Id.* at 27.  Shawn Peddy is HCI's superintendent.  *Id.* at 17.  HCI is in the business of spray applying polyurethane foam insulation.  *Id.* at 17.  About 70 percent of its business involves spraying polyurethane foam on wine storage tanks for wineries.  *Id.* at 18-19; Hulsey Decl. ¶ 3.  Hulsey testified at his deposition that HCI has about 80 employees.  Minser Decl., Ex. X (Hulsey Dep. Vol. 1) at 29.

In late 2016 or early 2017, HCI heard about an opportunity to work on PG&E lead abatement projects from Steve Mullan, the superintendent of a contractor named Brand Scaffolding, a company HCI had worked with for many years.  Minser Decl., Ex. Z (Peddy Dep. Vol. 1) at 78-79.  Hulsey describes the projects in his declaration as PG&E "lead abatement

---

[2] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

[3] The facts set forth below are undisputed unless otherwise stated. The Court notes that to the extent Plaintiffs assert that Hulsey's declaration is contradicted by his deposition testimony on some points, the Court relies on Hulsey's deposition testimony but flags any facts as to which Hulsey's declaration and his deposition testimony are inconsistent.

United States District Court
Northern District of California

projects at Airgas, LLC facilities in California."  Hulsey Decl. ¶ 5. These projects are referred to herein as "Airgas projects."  HCI's "friends at Brand [Scaffolding]" told Hulsey and Peddy that HCI could earn 3 to 4 million dollars if it was hired on to these projects.  *Id.*, Ex. X (Hulsey Dep. Vol. 1) at 74.  Mullan also told HCI that in order to qualify for the Airgas projects it would have to affiliate with a union.   Minser Decl., Ex. Z (Peddy Dep. Vol. 1) at 82-83.  It appears to be undisputed that HCI had never had any experience or interactions with a union.  Hulsey Decl. ¶ 4.

Sometime in April or May of 2017, Peddy went to the office of Brand Scaffolding, in Fresno, California, where he met with Mullan.  *Id.* at 89-93.  Mullan gave Peddy a copy of a document that Peddy understood to be an agreement to work on the projects, which he recalled was entitled Project Labor Agreement ("PLA").  *Id.* at 89. That same day, Peddy called Jeffrey Roberts, from the Union and met with him at Roberts's office.[4]  *Id.* at 94-99. According to Peddy, he was by himself when he met Roberts that day.  *Id.* at 94-95.  Roberts looked at the PLA and told Peddy that the Union couldn't "comply with that document."  *Id.* at 95-97.  Roberts then asked Peddy what HCI does and told him, "we don't have an agreement for what you guys do" but went on to say "we could make it work out."  *Id.*  at 97.  Roberts then told Peddy about the benefits of union membership.  *Id.*

At Peddy's deposition, counsel questioned Peddy about what representations Roberts made to him about union membership in the following exchange:

> Counsel: . . . you indicated that Mr. Roberts told you that . . . only HCI employees who would do work for PG&E projects would be union members.
>
> Peddy: Yes.
>
> Counsel: . . . Did he say that specifically to you?  Did he use those words? . . .
>
> Peddy:  Answer is yes from my point of view.  Did he say it like you put them, no.

---

[4] As to this initial telephone contact with the Union, Hulsey states in his declaration, "Since lead abatement is done by painting, we telephoned Local 294 of District Council 16, what we understood as the Painters Union of Northern California, the 'Union' herein, to inquire whether its workers on such a project could associate with the Union for purposes of the Airgas projects only."  Hulsey Decl. ¶ 7 (emphasis added).  There is no evidence that Hulsey was involved in this initial telephone contact, however.

1

2 Counsel:  How did he say it from your point of view?

3 Peddy:  He said it categorically the union can't comply with all that we do. My evaluation of what he's telling me, we can't – they can't, and if we become we, we can't the way things are now.  The way things are at that point.  That's why I'm saying yes.

4

5 Counsel:  So from your point of view he said that the union can't comply with what you guys do and you interpreted that as him indicating that only HCI employees who are working on PG&E projects would be union members.

6

7 Peddy:  Yes.

8 *Id.* at 116.

9   On June 14, 2017, Roberts met with both Hulsey and Peddy to discuss the possibility of

10 HCI affiliating with the Union. *Id.* Ex. X (Hulsey Dep. Vol. 1) at 71-72; *id.*, Ex. Z (Peddy Dep.

11 Vol. 1) at 120. During this meeting, Roberts told Hulsey that the Union had members skilled in

12 protective coating work, had training facilities, and could help HCI with lead abatement. *Id.*, Ex. X

13 (Hulsey Dep. Vol. 1) at 75-76. Hulsey testified at his deposition that at the meeting he was

14 "decisive that [his] company [didn't] want to be a union company." *Id.* at 77. He explained to

15 Roberts that as to his private sector customers, like Gallo, the "prices are very tight" and that if he

16 had to pay union wages, he would not be able to "win any jobs" and that he did "not want to lose

17 [his] company." *Id.*  at 83-84.  According to Hulsey, Roberts told him, "[d]on't worry about it"

18 and that the union would "help [HCI] find jobs." *Id.* at 84;  *see also id.* at 88 (testifying that

19 Roberts said the Union would provide HCI with "leads and work."). At his deposition, Hulsey

20 confirmed that he was "looking for referrals from the union for work -- for union projects." *Id*. at

21 84.[5]

22   Hulsey testified to signing documents at the June 2017 meeting, including the Agreement

23 of Employers.  *Id.* at 94-96; Minser Decl. ¶ 43 & Ex. AB (Agreement of Employers). He further

24 testified that he recalled signing the Agreement of Employers but that he did not read it when he

25

26 ―――――――――

27 [5] In his declaration, Hulsey provided a different description of what was said about Union work at this meeting, stating: "Roberts was again repeatedly reminded that HCI employees not working at the PGE/Airgas projects had to remain non-union employees, or HCI could not associate itself in any way with the Union. Roberts repeatedly reassured HCI agents that this was the agreement." Hulsey Decl. ¶ 9.

28

United States District Court
Northern District of California

4

signed it; he also recalled that Roberts explained the agreement to him but he did not remember anything specific about what Roberts told him. *Id.* at 96-99.[6]  According to Union records, Hulsey also signed the following documents that day: 1) the 2014-2017 Northern California Painters Master Agreement ("2014-2017 Master Agreement")[7]; 2) the 2016-2017 Fresno Area Addendum to the Northern California Painters Master Agreement between the Union and the Northern California Painting and Finishing Contractors Association ("2016-2017 Fresno Area Addendum"); and 3) the 2014-2017 Sacramento Area Addendum to the Northern California Painters Master Agreement between the Union and the Northern California Painting and Finishing Contractors Association ("2014-2017 Sacramento Area Addendum").  Declaration of Robert A. Williams III in Support of Motion for Summary Judgment (dkt. no. 110-1) ("Williams Decl.") ¶¶ 3-5 & Exs. A-C.

When Plaintiffs' counsel showed Hulsey at his deposition a photo depicting the booklet forms of the 2014-2017 Master Agreement and the 2017-2020 Northern California Painters Master Agreement ("2017-2020 Master Agreement"), Hulsey testified that the booklets in the photograph were familiar to him. Minser Decl., Ex. X (Hulsey Dep. Vol. 1) at 112, 134-135; Minser Decl, ¶ 45 & Ex. AD.  He further testified that he had signed the signature page at the back of one of the booklets and that he was given the booklet to take home, but that he had never read it.[8]  Minser Decl., Ex. X (Hulsey Dep. Vol. 1) at 122-123; *id.*, Ex. Y (Hulsey Dep. Vol. 2) at 6-7,

---

[6] In contrast, in his declaration, Hulsey stated: "Roberts on June 14, 2017 had me sign a post-card size 'Agreement of Employers Regarding Bay Area Painters and Tapers Trust Funds' wherein HCI agreed to contribute to the trust funds, but Roberts assured Peddy and myself that this only applied to employees working the PGE/Airgas projects, and further paperwork would be drafted to identify those employees."  Hulsey Decl. ¶ 10.  Hulsey stated further that "Roberts did not give [him] a copy of the post-card size 'Agreement of Employers Regarding Bay Area Painters and Tapers Trust Funds.' "  Id.

[7] Williams explains in his declaration that "[t]he signature page signed by Roberto Hulsey that is attached to the 2014-2017 Painters Master Agreement (Exhibit A) was originally attached to the booklet form of the 2014-2017 Painters Master Agreement. This is the reason that the numbering on the executed signature page differs from the remainder of Exhibit A. The content and text of the booklet form of the 2014-2017 Painters Master Agreement is identical to the form attached as Exhibit A." Williams Decl. at p. 2 n. 1.

[8] Hulsey's declaration directly conflicts with his deposition testimony on the question of whether he was given a copy of the Master Agreement he signed.  In the declaration he states:  "Neither HCI nor Mr. Hulsey ever received a Collective Bargaining Agreement, *a Master Agreement*, or a Trust Agreement, to read and/or sign from Roberts or the Union." Hulsey Declaration, ¶11 (emphasis added).

United States District Court
Northern District of California

10-11.  Hulsey testified that he did not recall Roberts ever telling him not to read the 2014-2017 or 2017-2020 Master Agreements and confirmed that Roberts did not coerce him into signing any documents.  Minser Decl., Ex. Y (Hulsey Dep. Vol. 2) at 14-15.

When Peddy was shown the same photograph of the booklet forms of the Master Agreements, he recognized the logo on the booklets, and testified that Roberts showed him a copy of the 2014-2017 Master Agreement booklet at his initial solo meeting with Roberts but that he did not pick it up off the counter.  Minser Decl., Ex. AA (Peddy Dep. Vol. 2) at 32-37.  According to Peddy, he did not know why the booklet was presented to him and Roberts neither told him to read the booklet nor instructed him not to read it.  *Id.*

Hulsey met Roberts a second time in September 2017.  Minser Decl., Ex. X (Hulsey Dep. Vol. 1) at 107.  At his deposition, Hulsey did not recall what exactly was discussed at this meeting but did remember that he and Roberts signed some documents that were agreements or contracts.  *Id.* at 108.  Hulsey also confirmed that his signature appears on the executed signature page of the 2017-2020 Master Agreement. *Id.* at 109-110;  Minser Decl. ¶44 & Ex. AC.

Union records reflect that Hulsey signed the following documents on September 1, 2017: 1) the 2017-2020 Master Agreement;  and 2) the 2017-2020 Fresno Area Addendum to the Northern California Painters Master Agreement between the Union and the Northern California Painting and Finishing Contractors Association ("2017-2020 Fresno Area Addendum").  Williams Decl. ¶¶ 6-7 & Exs. D, F.  Union records further reflect that on June 23, 2017, Hulsey signed a memorandum of agreement ("MOA").  Williams Decl. ¶ 8.  According to the Union, "The MOA excludes two of Hulsey Contracting's existing projects – the Wine Group, Sanger, CA and E&J Gallo Winery, Livingston, CA from the purview of the 2014-2017 and 2017-2020 Master Agreements, 2016-2017 and 2017-2020 Fresno Area Addendums, and the 2014-2017 Sacramento Area Addendum for a period of 12 months from the effective date of the MOA." Williams Decl. ¶ 8 & Ex. G.

Peddy acknowledged being copied on an email dated September 5, 2017 from Roberts to Lauren Brown of the IUPAT, in which Roberts states: "Hulsey Contracting is an Industrial Painting Contractor. They have never been signatory to any Union so everything will be new to

them. I appreciate everything you can do to make the transition a smooth one." Minser Decl., Ex. Z at p. 189:9-11; 190:23-191:2; 191:9; 193:4-13; Supplemental Declaration of Matthew Minser in Support of Plaintiffs' Summary Judgment Motion (dkt. no. 120) ("Minser Supp. Decl.") ¶ 3 and Ex. AE-2 attached thereto). Peddy agreed that nothing in this email indicated that HCI would be allowed to remain non-union.  Minser Decl., Ex. Z at p. 193:14-18.

### 2.  Use of Union Labor by HCI

Hulsey testified that HCI used Union employees on a number of projects even though the jobs did not require union affiliation because they "were supposed to have skills on our trade" and he was "trying their employees."  Minser Decl., Ex. Y (Hulsey Dep. Vol. 2) at 46; *see also* Minser Decl., Ex. AA (Peddy Dep. Vol. 2) at 39-40 (testifying that union members Jeremy Pennington, Francisco Harper, Froilan Gonzalez, Armando Arias, Felix Martinez, and Adrian Arias worked on projects for HCI).  These included jobs for E.J. Gallo wineries, The Wine Group, Constellation Brands, Cambria Estates, and Ammonia Refrigeration.  *Id.*  at 46-47.  According to Hulsey, however, Peddy was the only HCI employee who joined the union.  Hulsey Decl. ¶ 13.  Hulsey explained that this was because Roberts had told him that HCI needed at least one union employee to work the Airgas projects.  *Id.*

Hulsey further states in his declaration that "[t]he Union never had a 'Spray Applied Polyurethane Foam & Coating' wage schedule or defined skill set, which was the labor that HCI's workers performed on their non-PGE/Airgas jobs, their normal work."  *Id.* 14.  Plaintiffs, however, present evidence that "around June 2017, the Union authorized . . . Roberts . . . [to] negotiate a special competitive wage and fringe schedule that would have given Hulsey Contracting the ability to pay on a special rate schedule on its winery work (all of which constituted covered work under the [Collective] Bargaining Agreements)."  Williams Decl. ¶ 10.  According to Williams, "Hulsey Contracting declined the special rate schedule and told Mr. Roberts that they could meet the rates of the area. Therefore, no special schedule was negotiated or drafted."  *Id.*

According to Hulsey, from June 2017 to late 2018, HCI paid employer contributions in connection with its work on the Airgas projects, amounting to approximately $100,000.  Hulsey

United States District Court
Northern District of California

Decl. ¶ 15.  Hulsey states that HCI "quit bidding" on the Airgas jobs and ended its affiliation with the Union in January of 2019 because "dealing with the Union . . . was not worth the extra revenue."  *Id.*

### 3.  The Collective Bargaining Agreements

The 2014-2017 Master Agreement was in effect from July 1, 2014 through June 30, 2017, and thereafter continued from year to year beginning July 1, 2017 unless either party to the agreement gave notice to the other party, in writing, of their desire to change or revise the agreement. Williams Decl. ¶ 3 & Ex. A.  No notice was given by either party to terminate the 2014-2017 Master Agreement. *Id.*

The 2016-2017 Fresno Area Addendum signed by HCI on June 14, 2017, which addends the 2014-2017 Master Agreement, was in effect from January 1, 2016 through August 31, 2017. *Id.* ¶ 4 & Ex. B.  Thereafter, the Fresno Area Addendum continued from year to year, commencing as of 12:01 a.m., September 1st, unless notice was given by one of the bargaining parties of its desire to effect changes in hours, wages or working conditions.  *Id.*   No notice was given by either party to terminate the 2016-2017 Fresno Area Addendum.  *Id.*

The 2014-2017 Sacramento Area Addendum signed by HCI on June 14, 2017, which addends the 2014-2017 Master Agreement, was in effect from July 1, 2014 through July 31, 2017. Williams Decl. ¶ 5 & Ex.  C.  Thereafter, the Sacramento Area Addendum continued from year to year, commencing as of 12:01 a.m., July 1st, unless notice was given by one of the bargaining parties of its desire to effect changes in hours, wages or working conditions.  *Id.*[9]  No notice was given by either party to terminate the 2014-2017 Sacramento Area Addendum. *Id.*

The 2017-2020 Master Agreement signed by HCI on September 1, 2017, was in effect from July 1, 2017 through June 30, 2020, and thereafter continued from year to year beginning July 1, 2020 unless either party to the agreement gave notice to the other party, in writing, of their desire to change or revise the agreement. *Id.* ¶ 6 & Ex. D. Such notice should have been presented

---

[9] To the extent that the date on which the year-to-year extensions commenced (July 1) was before the stated end date of the agreement (July 31), it may be that there is a typographical error in this agreement as to one of those dates.  This error has no bearing on the Court's analysis.

United States District Court
Northern District of California

by one party to the other party during the month of January 2020 by certified mail that said party wishes to withdraw from the 2017-2020 Master Agreement. *Id.* The Union terminated the 2017-2020 Master Agreement effective upon its expiration on June 30, 2020. *Id.* ¶ 6 & Ex. E.

The 2017-2020 Fresno Area Addendum signed by HCI on September 1, 2017, which addends the 2017-2020 Master Agreement in certain respects, was in effect from September 1, 2017 through August 31, 2020. *Id.* ¶ 7 & Ex. F. Thereafter, the Fresno Area Addendum continued from year to year, commencing as of 12:01 a.m., September 1st, unless notice was given by one of the bargaining parties of its desire to effect changes in hours, wages or working conditions. *Id.* Based on the Union's termination of the 2017-2020 Master Agreement effective upon its expiration after June 30, 2020, the 2017-2020 Fresno Area Addendum Union was also effectively revoked on June 30, 2020. *Id.*

The 2014-2017 and 2017-2020 Master Agreements, 2016-2017 and 2017-2020 Fresno Area Addendums, the 2014-2017 Sacramento Area Addendum, and the MOA are hereinafter referred to as "Collective Bargaining Agreements." The Trust Funds are third party beneficiaries of the Collective Bargaining Agreements. *Id.* ¶ 9.

### 4. Agreement of Employers

The Agreement of Employers, which was signed by Hulsey on June 14, 2017, states:

> The undersigned employer agrees to pay the monthly contribution for each employee required by the collective bargaining agreement affecting painters then in effect to the Bay Area Painters Pension Trust Fund, the Bay Area Painters Welfare Fund, Beneficial Fund, Supplemental Holiday Fund and Joint Apprenticeship Funds, and to be bound in all respects by the collective bargaining agreement, and the Trust Agreements.
>
> From the day an employee earns his right to contributions to these trust funds, to the day said contributions are actually received by the designated depositary the employer agrees to hold said sums as trustee and in trust for the benefit of the employees earning said contributions are retained by employer for said time period for administrative convenience and for the purpose of securing a faithful performance by the employees and their union representative of a contract of employment.
>
> **The individual whose signature appears below on behalf of the employer, agrees to be personally and individually liable for said contributions.**

Minser Decl., Ex. AB (Agreement of Employers) (emphasis added).  Directly below this language, the form has lines for "Name of Employer", "Name of Person Signing on Behalf of Employer" and "Signature."  *Id.*   On the agreement signed on June 14, 2017, "Hulsey Contracting" is handwritten on the first line and "Roberto Hulsey" is handwritten on the second line.  The next line contains Hulsey's signature.  *Id.*

### 5.  Trust Agreements

The Collective Bargaining Agreements require employer contributions to the Plaintiff Trust Funds and authorize the Trust Funds to collect and distribute those contributions.   *See* Williams Decl., Ex. A (2014-2017 Master Agreement), Article 17, § 4(a); *id.,* Ex.  B (2016-2017 Fresno Area Addendum), Article 17 §1; *id.*, Ex. C (2014-2017 Sacramento Area Addendum), Article 17 § 2(a); *id.*, Ex. D (2017-2020 Master Agreement), Article 17, § 4(a); *id.*, Ex. F (2017-2020 Fresno Area Addendum), Article 17 §1. The Collective Bargaining Agreements incorporate (specifically or by reference) the terms of the Trust Agreements establishing the Trust Funds ("Trust Agreements"), which also require employers to pay contributions to the Trust Funds. *See* Williams Decl., Ex. A (2014-2017 Master Agreement), Article 17, § 2; *id.,* Ex.  B (2016-2017 Fresno Area Addendum), Article 17 § 2; *id.*, Ex. C (2014-2017 Sacramento Area Addendum), Article 17 § 2(a); *id.*, Ex. D (2017-2020 Master Agreement), Article 17, § 2; *id.*, Ex. F (2017-2020 Fresno Area Addendum), Article 17 § 2.

### 6.  Employer Obligations Under Collective Bargaining Agreements and Trust Agreements

Each month, employers are sent Contribution Report Forms to self-report the hours worked by their employees who performed work covered under the terms of the Collective Bargaining Agreements. Williams Decl. ¶18; Declaration of Colleen Christopherson in Support of Plaintiff's Motion for Summary Judgment (dkt. no. 110-3) ("Christopherson Decl.") ¶7; Williams Decl., Ex. A (2014-2017 Master Agreement), Article 17, § 1; *id*., Ex. D (2017-2020 Master Agreement), Article 17, § 1.  The 2014-2017 Master Agreement and the 2017-2020 Master agreement define "covered work" as follows:

1

> Covered work shall be and mean the following materials and application methods: paints, pigments, oils, turpentine, japan dryers, thinners, varnishes, lacquers, shellac, stains, fillers, waxes, cement, joint cement, water and other vehicles; mediums that may be mixed and applied to the surfaces of materials and buildings, edifices, structures, monuments and the appurtenances thereto, of every type and description in their natural state of condition, or constructed or fabricated of any material or materials whatsoever and provided; work or services pertaining to: the application of texture, acoustic, plaster and stucco materials of all types and thickness on all surfaces.

2

3

4

5

6   Williams Decl., Ex A (2014-2017 Master Agreement) Article 4 § 1; *id.*, Ex. D (2017-2020 Master

7   Agreement) Article 4 § 1. Both versions of the Master Agreement go on to specifically provide

8   that covered work includes "[w]ork or services pertaining to the application of protective coatings

9   . . . [including] urethanes . . ."; "[w]ork or services pertaining to the application of . . . insulation

10  materials used on structural items or as architectural finishes"; and "[w]ork or services pertaining

11  to lead removal and encapsulation." Williams Decl., Ex A (2014-2017 Master Agreement) Article

12  4 § 1(c), (g) & (l); *id.*, Ex. D (2017-2020 Master Agreement) Article 4 § 1(c), (g) & (l).

13       The Collective Bargaining Agreements provide that all contribution report forms with

14  payment are due on or before the fifteenth (15th) day of the month following the month in which

15  hours were worked and are considered delinquent if not received by the end of that month.

16  Williams Decl. ¶18 (citing Ex. A (2014 – 2017 Master Agreement) Article 17, §4(b); Ex. D (2017-

17  202 Master Agreement) Article 17, §4(b));  Christopherson Decl. ¶7. If contributions are

18  delinquent, the Collective Bargaining Agreements and Trust Agreements mandate that the

19  employer pay liquidated damages and interest assessed on the delinquent contributions. Williams

20  Decl. ¶18 (citing Ex. A (2014-2017 Master Agreement) Article 17, §4(c); Ex. D (2017-2020

21  Master Agreement) Article 17, §4(c); Ex. I (District Council 16 Health and Welfare Trust Fund

22  Agreement) Article III § C(2)-(3); Ex. J (Bay Area Painters and Tapers Pension Trust Fund Trust

23  Agreement) Article III § C(2)-(3); Ex. K (District Council 16 Northern California Journeyman and

24  Apprentice Training Trust Fund Agreement) Article III §C(2)-(3)).

25       The Collective Bargaining Agreements and Trust Agreements require employers to

26  maintain time records or timecards, and to submit any and all relevant records to Plaintiffs for

27  examination to determine whether it is making full and prompt payment of all sums required to be

28  paid by it to Plaintiffs. Williams Decl. ¶22 (citing Ex. A (2014-2017 Master Agreement), Article

United States District Court
Northern District of California

11

17, §5; Ex. D (2017-2020 Master Agreement) Article 17, §5; Ex. I (District Council 16 Health and Welfare Trust Fund Agreement), Article III § D; Ex. J, Article III §D; Exhibit K (Bay Area Painters and Tapers Pension Trust Fund Trust Agreement) Article III §D); Christopherson Decl. ¶13).

Pursuant to the Collective Bargaining Agreements and Trust Agreements, the amount of liquidated damages shall be the greater of twenty percent (20%) of the delinquent contributions or one hundred fifty dollars ($150.00) per month where a lawsuit has been filed. Williams Decl. ¶19 (citing Ex. A (2014-2017 Master Agreement) Article 17, §4(c); Ex. D (2017-2020 Master Agreement) Article 17, §4(c); Ex. I (District Council 16 Health and Welfare Trust Fund Agreement) Article III § C(2); Ex. J (Bay Area Painters and Tapers Pension Trust Fund Trust Agreement) Article III §C(2); Ex. K (District Council 16 Northern California Journeyman and Apprentice Training Trust Fund Agreement) Article III §C(2)). However, if the delinquencies are paid prior to the filing of a lawsuit, liquidated damages shall be the greater of ten percent (10%) of the delinquent contributions or one hundred fifty dollars ($150.00), not to exceed seven hundred fifty dollars ($750.00) per month. *Id.*

Pursuant to the Collective Bargaining Agreements and Trust Agreements, amounts due in interest are assessed at rates determined by the Trustees of the Trust Funds. Williams Decl. ¶20 (citing Ex. A (2014-2017 Master Agreement) Article 17, §4(c); Ex. D (2017-2020 Master Agreement) Article 17, §4(c); Ex. I (District Council 16 Health and Welfare Trust Fund Agreement) Article III § C(3); Ex. J (Bay Area Painters and Tapers Pension Trust Fund Trust Agreement) Article III §C(3); Ex. K (District Council 16 Northern California Journeyman and Apprentice Training Trust Fund Agreement) Article III §C(3)). The Trustees have determined that interest is to be assessed at 5% of the delinquent contributions, from the date an employer becomes delinquent until the contributions are paid. Williams Decl. ¶¶ 20, 23 & Ex. L (Collection Procedures in effect from February 11, 2020 through May 8, 2023 ("2020 Collection Procedures"); Ex. M (Collection Procedures in effect from November 3, 2015 to February 11, 2020 ("2015 Collection Procedures"); *see also* Minser Decl. ¶ 48 & Ex. AF (2020 Collection Procedures); Ex. AG (2015 Collection Procedures).

The Collective Bargaining Agreements and Trust Agreements also provide for reimbursement of attorneys' fees and any other expenses, including costs and audit fees, incurred in connection with the collection of delinquent contributions. Williams Decl. ¶21 (citing Ex. A (2014-2017 Master Agreement) Article 17, §4(c); Ex. D (2017-2020 Master Agreement) Article 17, §4(c); Ex. I (District Council 16 Health and Welfare Trust Fund Agreement) Article III § E; Ex. J (Bay Area Painters and Tapers Pension Trust Fund Trust Agreement) Article III §E; Ex. K (District Council 16 Northern California Journeyman and Apprentice Training Trust Fund Agreement) Article III §E).

### 7. Delinquent Contributions and Audit Procedures

Pursuant to both the 2015 and the 2020 Collection Procedures, when an employer fails to submit monthly contribution reports to report the hours worked by its employees (and pay the fringe benefits due thereon), the Trust Funds are authorized to make an estimate of the unreported contributions due. Williams Decl. ¶ 24 (citing Ex. L (2020 Collection Procedures) § G; Ex. M (2015 Collection Procedures) § G). Section G of the 2015 and 2020 Collection Procedures provides:

> Unreported contributions, where the Employer fails or refuses to submit missing contribution reports, shall be estimated based on the last report submitted, on the average of the last 3 months reported, or on the average of the last 3 months, whichever is greater.

*Id.*

The Board of Trustees of the Trust Funds have also adopted the "Restated Audit and Audit Collection Procedures" ("Audit Procedures"). Christopherson Decl. ¶15 & Ex. F (Audit Procedures in effect from November 17, 2020 to present ("2020 Audit Procedures")), Ex. G (Audit Procedures in effect from November 3, 2015 through November 16, 2020 ("2015 Audit Procedures")). Pursuant to both the 2015 and 2020 Audit Procedures, an employer is assessed full audit fees in the following circumstances: a) where net underpayments found on an audit equal or exceed 10% of an employer's correct contributions for the audit period; b) where an employer fails to maintain records in accordance with the collective bargaining agreements causing a surplus of work by the auditor; or c) where the employer intentionally or negligently omits, deletes, misclassifies or otherwise provides fraudulent reports or records. Christopherson Decl. ¶15 (citing

Exhibit F (2020 Audit Procedures) Article II, §D(1); Ex. G (2015 Audit Procedures) Article II, §D(1)).

### 8. HCI Audit

On January 15, 2019, Tim Hallenbeck, a principal with Lindquist, a certified public accounting firm that performs compliance work for the Trust Funds,[10] sent a notification letter to HCI requesting that Defendant contact Lindquist to schedule "courtesy compliance testing" as part of a program "where the payroll records of all new contributing employers are tested to determine that all contributions made to the Trust are in accordance with Trust rules." Hallenbeck Decl. ¶ 4 & Ex. A (notification letter). The period to be covered was July 1, 2017 "to the present." *Id.* According to Hallenbeck, his office spoke with Roberto Hulsey on several occasions but "he became non-responsive and did not comply with the testing request." *Id.* ¶ 5. Consequently, Lindquist referred the matter to the Trusts' counsel, Saltzman & Johnson Law Corporation ("Saltzman & Johnson"), to obtain the documents required to complete the inspection. *Id.* ¶ 6.

On April 9, 2019, Matthew Minser, a Saltzman & Johnson attorney, received Lindquist's referral and sent a demand letter to Hulsey and HCI requesting that they comply with an audit of their payroll records for the period July 1, 2017 to the time of inspection. Minser Decl. ¶ 7 & Ex. C. According to Hallenbeck, after "several months," documentation was produced by HCI allowing the testing to be completed. Hallenbeck Decl. ¶ 7. However, correspondence between Hallenbeck and Robert Williams, of the Union, indicate that the records maintained by HCI were not complete. In particular, Hallenbeck wrote in a January 24, 2020 email to Williams on which Saltzman & Johnson attorneys were copied:

> I'm writing to request direction regarding issues with the above audit. Hulsey provided payroll and project information, but claims they do not maintain any timekeeping records necessary to identify which hours were worked on which project. This is an issue because Hulsey performs covered and non-covered work and has an approved list of

---

[10] The certified public accounting firm, Lindquist LLP, was acquired by Withum Smith+Brown, PC on January 1, 2022. Declaration of Tim Hallenbeck in Support of Plaintiffs' Motion for Summary Judgment (dkt. no. 110-5) ("Hallenbeck Decl.") ¶ 1. Because the audit of HCI was conducted prior to the acquisition, the Court refers to the firm as "Lindquist" herein.

> red circle[11] projects pursuant to an MOA. We attempted to separate employees in covered versus non-covered classifications; however, apparently Hulsey commingles covered and non-covered employees under the same workers compensation classifications.
>
> I've prepared the attached spreadsheet to illustrate this situation and compare the number of hours worked per payroll records to the number of hours reported to the DC16 Trusts, by classification, by year.
>
> On one hand, charging benefits on all unreported hours will be overstating the liability since they have non-covered projects; however, on the other hand, they've left no alternatives by not maintaining appropriate records.
>
> The result will be charges for over 92,000 hours. The Company's owner and accountant have been generally advised that we may have to charge for all hours, but we have not discussed the potential dollar amount.
>
> Please advise if you approve of moving forward with charging on all unreported hours and placing the burden of proof on the employer, or if we should consider another approach.

Minser Decl., Ex. AK (January 24, 2020 email).  Likewise, Hallenbeck states in his declaration:

> We noted Hulsey Contracting did not provide adequate records to verify the accuracy of hours and contributions reported to the Trust Funds, as required by the Collective Bargaining Agreements. Due to inadequate records, we were directed by the Plaintiff Trust Funds to quantify discrepancies for all unreported hours listed on the Company's payroll records and for all unreported non-union subcontractors.

Hallenbeck Decl. ¶ 13 (citing Ex. B (audit report)).

In the report itself, Lindquist provides a more detailed description of the inadequate records and how it handled them in conducting the audit:

> During our testing, the Company was unable to provided job cost reports, job hours, labor distribution and timecards or similar documents to determine the hours worked in District Council 16 jurisdiction, including the hours for Red Circle Agreement jobs; therefore, we quantified all hours on payroll except for office employees as directed by Local 294 and the Trust Fund Office. The Company has been advised of the situation.
>
> We also were unable to determine which employees completed work in District Council 16 jurisdiction as the Company had two workers' compensation job classifications and all employees were listed under

---

[11] This refers to the projects covered by the MOA, discussed above, which was referred to internally as a "red circle agreement."  *See* Plaintiffs' Motion at 4 n. 1.

both job classifications. The employees that were never reported to the Trust are classified on the attached report as an "Unknown Journeyman" and quantified at the Journeyman fringe rate.

Non-signatory subcontractor or individual performed work covered by the collective bargaining agreement but was not reported to the Trust. The number of hours listed was estimated by dividing total invoices dollar amounts by Journeyman wage rate.

Hallenbeck, Ex. B (audit report).

The draft audit report covers the period July 1, 2017 through August 31, 2019 and quantifies discrepancies for all unreported hours listed on HCI's payroll records and for all unreported non-union subcontractors. Hallenbeck Decl. ¶ 13. It found that the total due for unreported hours was $1,520,264.57. Hallenbeck, Ex. B. The audit found that HCI owed interest in the amount of $126,481.08. *Id.* It also found that HCI was liable for liquidated damages and audit fees. *Id.* According to Hallenbeck, the cost of the audit was $9,625.75. Hallenbeck Decl. ¶ 15.

 The draft audit report was sent to HCI, to the attention of Roberto Hulsey, on May 11, 2020. Hallenbeck Decl. ¶ 8 & Ex. B.   Pursuant to "Trust policy," HCI was given two weeks to review the report and submit in writing any questions and/or disagreements relative to the findings, along with supporting documentation. *Id.*   According to Hallenbeck, "[a]s Hulsey Contracting did not provide documentation to prompt any revisions to the draft report, the results are final." *Id.*

### 9.  HCI's failure to Report and Pay Contributions

According to the Plaintiffs' counsel, on or about February 6, 2020, his office was informed by the Trust Funds' administrator, Health Services & Benefit Administrators, Inc. ("HS&BA") that HCI had failed to submit its contributions for November 2018 in the reported amount of $24,006.06 and its contribution reports and payments for January 2019 through December 2019. Minser Decl. ¶ 16;  *see also*  Christopherson Decl. ¶ 18 (stating that Hulsey Contracting reported $24,006.06 in contributions for November 2018) & Ex. H (October 2018, November 2018 and December 2018 contribution reports).  Minser states that on or about February 11, 2020, his office sent a demand letter to HCI's attorney, Nathan Mubasher, requesting that HCI submit its delinquent payment for November 2018 and its delinquent contribution reports and payments for

United States District Court
Northern District of California

1   January 2019 through December 2019. *Id.* ¶ 17 & Ex. I (demand letter).

2       Mubasher responded to the February 11, 2020 demand letter with an email to a Saltzman

3   & Johnson attorney dated February 18, 2020 asking for "the collective bargaining agreement and

4   trust agreement referenced in the demand letter."  Minser Decl., Ex. AN (email thread between

5   Mubasher and Saltzman & Johnson attorneys) at ECF p. 503.  The email chain supplied by

6   Plaintiffs indicates that Mubasher made this request again on February 21, 2020 and that on

7   August 14, 2020 he sent a letter to Saltzman & Johnson stating that as Plaintiffs' counsel had not

8   responded to his requests – and these documents were not attached to the original complaint – it

9   was "clear" that there was no collective bargaining agreement in place. Minser Decl., Ex. AM.

10  Plaintiffs also supply evidence that on August 17, 2020, Plaintiffs' counsel sent Mubasher copies

11  of the "Collective Bargaining Agreement" along with a copy of the signature page, signed by

12  Hulsey.  Minser Decl. Ex. AN at ECF pp. 489.[12] Although counsel stated in an August 14, 2020

13  email that they had sent these documents to Mubasher "some time ago," the attorney declined

14  Mubasher's request to provide "proof" of this, saying that she was "not going to go back through

15  all of [her] emails on this." *Id.* at ECF pp. 489-491.

16      According to Minser, as of the time of the filing of Plaintiffs' Motion for Summary

17  Judgment, HCI had not submitted contribution reports for the following months: September 2019,

18  October 2019, November 2019, December 2019, January 2020, February 2020, March 2020, April

19  2020, May 2020, and June 2020.  Minser Decl. ¶ 49. In addition, Plaintiffs present evidence that

20  HCI reported but did not pay contributions due in the amount of $24,006.00 for November 2018.

21  Christoperhson Decl. ¶ 18 & Attachment found at dkt. no. 110-4 at ECF p. 118.

22      **10. The Complaint**

23      Plaintiffs filed this action against HCI on April 24, 2020, seeking unpaid contributions for

24  November 2018; contribution reports and payments for January 2019 through February 2020; any

25  additional contributions that became due during the course of the litigation, including those found

26

27  _____

28  [12] The exhibit supplied by Plaintiffs does not include the attachments to the email.  The header on the email reflects that the following were attached to it:  "Hulsey.pdf; Nor. Cal. Painters Master Agreement 2017-2020.pdf; DC16 Trust Agreement 072407.pdf." *Id.*

due based on timecards or audit; as well as liquidated damages and interest on all unpaid contributions, audit fees, and attorneys' fees and costs.

On August 12, 2020, the Union provided Plaintiffs' counsel with the Agreement of Employers, signed by Roberto Hulsey.   Minser Decl. ¶ 23.   Because that agreement provided for personal liability on Hulsey's part, Plaintiffs' counsel requested that the Court grant leave to amend to add Hulsey as an individual defendant and the Court granted that request.   ¶ 27.[13]   In the FAC, Plaintiffs assert the same claims as they asserted in the original complaint but now assert them against both HCI and Hulsey individually.

### B.   The Motions

#### 1.   Plaintiffs' Motion

Plaintiffs contend they are entitled to summary judgment on their ERISA claims against both HCI and Hulsey because the undisputed facts establish that both defendants are bound by the Collective Bargaining Agreements and Hulsey is also individually liable under the Agreement of Employers.   Plaintiffs seek an award of the following amounts:   1) $2,204,296.77 for the amounts due in connection with the audit (including $1,520,264.57 in unpaid contributions; $304,052.91 in liquidated damages at a rate of 20%;   interest through March 31, 2020 in the amount of $126,481.08 at a rate of 5%; interest for the period April 1, 2020 through June 15, 2023 in the amount of $243,872.46; and audit examination costs in the amount of $9,625.75); 2) $34,160.10 for the November, 2018 contribution that was reported but not paid and related amounts (including $24,006.06 for the unpaid contributions;   $4,801.21 in liquidated damages at a rate of 20%; and $5,352.83 in interest at 5% for the period January 1, 2019 through June 15, 2023); and 3) $258,674.84 for unreported contributions and related amounts for the months of September 2019 through June 2020 (including $189,860.60 in estimated unpaid contributions; $37,972.12 in liquidated damages at a rate of 20%; and $30,842.12 in interest at a rate of 5%). Plaintiffs' Motion at 13-14 (citing Hallenbeck Decl., Ex. B (audit report); Minser Decl. ¶¶ 48-60; Christopherson

---

[13] According to Plaintiffs' counsel, Defendants refused to stipulate to allow Plaintiffs to file an amended complaint, necessitating that Plaintiffs seek leave of Court to do so.   Minser Decl. ¶¶ 24-27.

United States District Court
Northern District of California

United States District Court
Northern District of California

Decl. ¶¶ 18-21).  In addition, Plaintiffs seek $72,458.50 in attorneys' fees and $10,027.18 in costs incurred between April 9, 2019 and May 31, 2023.  *Id.* at 14.

Defendants oppose Plaintiffs' Summary Judgment Motion on the grounds that there are fact questions as to whether a valid contract was formed and if the Union perpetrated fraud against them in connection with the Collective Bargaining Agreements and Agreement of Employers, pointing to the Hulsey Declaration to establish that there are genuine issues of material fact as to whether either Defendant is bound by the Collective Bargaining Agreements. Defendants' Opposition (dkt. no. 113) at 7-9.  They further assert that Plaintiffs are not entitled to summary judgment on the question of Hulsey's individual liability because: 1) the Agreement of Employers does not meet the requirements of the Statute of Frauds because Hulsey only signed "in a capacity for an employer"; 2) the agreement fails for lack of consideration; and 3) "to seek to hold an individual personally liable for such asserted massive business debt is contrary to public policy." *Id.* at 9-14. Defendants do not address or challenge any of the amounts requested in Plaintiffs' Motion.

In their Reply, Plaintiffs reject Defendants' reliance on the Hulsey Declaration to show that there are disputes of fact that preclude summary judgment, arguing that that declaration is a "sham affidavit" and should be disregarded.  Plaintiffs' Reply (dkt. no. 116) at 3-4. They further assert that the deposition testimony of Hulsey and Peddy, along with the other evidence they have presented showing that Hulsey signed the Collective Bargaining Agreements, establish that the Collective Bargaining Agreements are valid and enforceable and there was no fraud on the part of Plaintiffs, either in the inducement or the execution of the agreements.  *Id.* at 1-3.  According to Plaintiffs, the undisputed evidence further establishes that HCI is bound by the Collective Bargaining Agreements because it conducted itself like a signatory employer. *Id.*  at 4-5.  In particular, they point to deposition testimony by Peddy and Hulsey admitting that union labor was dispatched to work on job sites where it was not required and to the undisputed fact that HCI submitted contribution reports and paid contributions for some months. *Id.*  at 4-5.

As to Hulsey's individual liability, Plaintiffs contend in their Reply that the Agreement of Employers signed by Hulsey is enforceable because it clearly states that Hulsey will be held

19

individually liable for contributions and related amounts and there is ample case authority in the Ninth Circuit establishing that such a promise is enforceable. *Id.* at 5. They further assert that it is a valid personal guarantee under California law, which requires only that a guarantee be in writing and be signed by the guarantor and does not require that the writing "express a consideration." *Id.* (citing Cal. Civ. Code §2793). *Id.* at 6. Further, they contend the Agreement of Employers is an unconditional guarantee under Cal. Civ. Code § 2806 and therefore, there is no obligation that they obtain a judgment or exhaust their remedies against the principal debtor (HCI) before seeking to collect from Hulsey. *Id.* (citing Cal. Civ. Code § 2807; *Cooke v. Mesmer,* 164 Cal. 332 (912)).

Plaintiffs also reject Hulsey's assertion that the Agreement of Employers fails for lack of consideration, pointing to case authority that a benefit derived from an agreement by an officer or shareholder of a corporation is sufficient to constitute consideration. *Id.* at 7. Here, they contend, the Agreement of Employers, along with other documents that HCI signed to affiliate with the Union, benefited HCI and Hulsey by allowing HCI to bid on lucrative projects that required union affiliation. *Id.* at 7-8. This is sufficient to meet California's requirement that "a contract must have sufficient consideration[,]" Plaintiffs contend. *Id.* at 8 (citing Cal. Civ. Code §1550).

Finally, Plaintiffs reiterate their arguments in support of the specific amounts they seek to recover from Defendants on summary judgment. *Id.* at 10-15.

### 2. Hulsey Motion

In the Hulsey Motion, Hulsey asserts that he is entitled to summary judgment that he is not individually liable for the same reasons he opposes Plaintiffs' Motion on that question. Plaintiffs oppose Hulsey's motion on the same grounds they contend warrant summary judgment in their favor on this issue. Plaintiffs also assert a number of evidentiary objections to the Hulsey Declaration.[14] Plaintiffs' Opposition at 15-17.

---

[14] The Court does not rule on these objections as the reasoning upon which it relies to decide the instant motions does not depend on the sections of the Hulsey Declaration that Plaintiffs challenge.

United States District Court
Northern District of California

United States District Court
Northern District of California

### III.    ANALYSIS

#### A.    Legal Standards under Rule 56

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'"  *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .").  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court to scour the record in search of a genuine issue of triable fact.  *Id.*; *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir. 2003).  Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate.

1    *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

2      **B.    Whether Plaintiffs are Entitled to Summary Judgment that HCI is Bound by the Collective Bargaining Agreements**

3

4        **1.   Legal Standards Governing Enforcement of Collective Bargaining Agreements Under ERISA Where Fraud is Alleged**

5      "For an employer to be obligated to make employee benefit contributions to a trust fund,

6 there must exist a binding collective bargaining agreement." *Sw. Administrators, Inc. v. Rozay's*

7 *Transfer*, 791 F.2d 769, 773 (9th Cir. 1986) (citation omitted). The terms of collective bargaining

8 agreements are strictly enforced. *Emp. Painters' Tr. v. J & B Finishes*, 77 F.3d 1188, 1192 (9th

9 Cir. 1996). A party who signs a collective bargaining agreement is bound by it, even if the party

10 neither read the agreement nor considered the legal consequences of signing it. *Id.* at 1193.

11 "Parties to a collective bargaining agreement are conclusively presumed to have equal bargaining

12 power, and union agents have no duty to explain to employers the terms, conditions, or

13 consequences of a collective bargaining agreement." *Id.*

14      Trust funds are third party beneficiaries of collective bargaining agreements. *Rozay's*

15 *Transfer*, 791 F.2d at 773. While "[a] third-party beneficiary's rights are generally subject to any

16 contract defense which the promisor could assert against the promisee if the promisee were suing

17 on the contract[,]" "a collective bargaining agreement is not a typical third-party beneficiary

18 contract." *Id.* (citation omitted). Rather, "[f]or reasons of public policy, traditional contract law

19 does not apply with full force in actions brought under . . . ERISA[ ] to collect delinquent trust

20 fund contributions." *Id.* (citing *Southern California Retail Clerks Union and Food Employers*

21 *Joint Pension Trust Fund v. Bjorklund* ("*Bjorklund*"), 728 F.2d 1262, 1265 (9th Cir.1984)).

22      The ability of a trust fund to enforce a collective bargaining agreement in the face of fraud

23 allegations depends on whether the conduct at issue constitutes fraud in the inducement or fraud in

24 the execution. *Id.* at 774. "The former induces a party to assent to something he otherwise would

25 not have; the latter induces a party to believe the nature of his act is something entirely different

26 than it actually is." *Id.* "The distinction between these two types of fraud may be very significant

27 in determining the rights obtained by third parties as a result of an agreement." *Id.* The court in

28 *Rozay's Transfer* explains:

> Under traditional contract law and negotiable instruments law, personal property or a negotiable instrument transferred by virtue of a misrepresentation may subsequently be transferred to a bona fide purchaser for value or a holder in due course—innocent third parties who take in good faith and without notice of any defects in the chain of ownership. The defrauded party may recover the property from the bona fide purchaser or avoid honoring the negotiable instrument held by the holder in due course only if the initial transaction was "void" rather than merely "voidable." See J. Calamari & J. Perillo, Contracts § 9–22, at 293; J. White & R. Summers, Uniform Commercial Code § 14–9, at 572–75 (2d ed. 1980). Fraud in the execution results in the agreement being void ab initio, whereas fraud in the inducement makes the transaction merely voidable. See 12 Williston on Contracts § 1489, at 341–42.

*Id.*

The court in *Rozay's Transfer* illustrated the distinction between these two types of fraud by pointing to *Bjorklund*, which involved fraud in the inducement, and *Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501 (9th Cir. 1984) ("*Gilliam*"), which involved fraud in the execution. *Id.* at 773-774.

In *Bjorklund*, the court explained, "an employer signed a collective bargaining agreement relying upon the union representative's false assurance that the employer himself would be eligible to obtain a pension and that he would not be required to make contributions for his part-time employees." *Id.* at 773 (citing *Bjorklund*, 728 F.2d at 1263-1264, 1265). Under those circumstances, "[w]e held that the employer's assertion that he had been 'fraudulently induced' to enter into the agreement was not a legitimate defense to the trust fund's collection action." *Id.* (citing *Bjorklund*, 728 F.2d at 1266).

On the other hand, in *Gilliam*, "an employer signed a collective bargaining agreement under the impression that he was only applying to become a member of the union as an owner-operator so that he could operate his own equipment on a union job site." *Id.* at 774 (citing *Gilliam*, 737 F.2d at 1503). "When the trust fund brought an action to collect pension fund contributions owing under the agreement, [the court] held he was not obligated to make such payments as he had reasonably relied on the union's representation that he was signing a document of a wholly different nature." *Id.* (citing 737 F.2d at 1504-1505).

### 2.  Legal Standards Governing "Sham" Affidavits

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an

affidavit contradicting his prior deposition testimony." *Van Asdale v. Int'l Game Tech*., 577 F.3d 989, 998 (9th Cir. 2009) (quoting *Kennedy v. Allied Mut. Ins. Co*., 952 F.2d 262, 266 (9th Cir. 1991) ("*Kennedy*")). This rule is "necessary to maintain [the] principal" that summary judgment is not a "disfavored shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)) (internal quotations omitted). In particular, "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (quoting *Kennedy*, 952 F.2d at 266) (internal citation and quotations omitted).

Because the sham affidavit rule is "in tension with the principle that a court's role in deciding a summary judgment motion is not to make credibility determinations or weigh conflicting evidence[,]" courts should apply it "with caution." *Id.* (quoting *Sch. Dist. No. 1J v. ACandS, Inc*., 5 F.3d 1255, 1264 (9th Cir.1993)).  There are "two important limitations on a district court's discretion to invoke the sham affidavit rule." *Id.*  First, the district court must make "specific factual findings" that the affidavit was a sham because "the rule 'does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony[.]'" *Id.* (quoting *Kennedy*, 952 F.2d at 266-67).  Second, "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id.* at 998-999.  "Thus, 'the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit.' " *Id.* at 999 (quoting *Messick v. Horizon Indus*., 62 F.3d 1227, 1231 (9th Cir. 1995)).

### 3. Whether the Collective Bargaining Agreements are Binding as a Matter of Law Because the Undisputed Facts Establish that there was no Fraud in the Execution

Defendants contends Plaintiffs are not entitled to summary judgment because there is evidence in the record that Hulsey was tricked by the union representative into signing the

Collective Bargaining Agreements. *See* Defendants' Opposition (dkt. no. 114) at 8, 13-14. Defendants assert that this conduct constitutes fraud in the execution, as in *Gilliam*, giving rise to material issues of fact as to whether the Collective Bargaining Agreements are void. *Id.* at 14. The Court disagrees.

As discussed above, fraud in the execution occurs when the conduct or representations of the union leads the employer to reasonably believe that the document that it has signed is something "entirely different" from what it actually is. *Rozay's Transfer*, 791 F.2d at 773. In *Gilliam*, for example, the circumstances under which the agreements were signed were such that the employer had no idea he was signing a collective bargaining agreement: the union representative had only told him that the documents were "forms for owner-operators" and had filled them in with information supplied by the employer, having the employer sign or initial at designated spots. *Gilliam*, 737 F.2d at 1504. The union representative also did not provide the employer with copies of the short form agreement or the master agreement at the time of signing. *Id.* Under those circumstances, the employer reasonably believed that he was not signing a collective bargaining agreement but instead, was filling in forms to apply for membership. *Id.*

Here, Hulsey's deposition testimony establishes that the union representative gave him a booklet form master agreement, that Hulsey signed the signature page at the back of the booklet and that he was given the booklet to take home, as discussed above. Hulsey further testified that the union representative did not threaten him or in any way discourage him from reading the agreement. Nor is there any evidence that the union representative – through conducts or statements – led Hulsey to reasonably believe he was signing anything other than a collective bargaining agreement. The only evidence that contradicts Hulsey's deposition testimony on this question is his own statement, in his declaration, that he did not "ever receive[ ] a Collective Bargaining Agreement, a Master Agreement, or a Trust Agreement, to read and/or sign from Roberts or the Union." Hulsey Decl. ¶ 10. The Court finds that as to that statement, however, the declaration is a sham.

The Court recognizes that not every declaration that is inconsistent with a witness's deposition testimony is a sham; as discussed above, a declaration that is inconsistent with prior

United States District Court
Northern District of California

United States District Court
Northern District of California

deposition testimony is not a sham if the statements in it "were the result of an honest discrepancy, a mistake, or the result of newly discovered evidence." *Kennedy*, 952 F.2d at 267. Here, however, there is no evidence in the record suggesting that the inconsistency is the result of an honest discrepancy, a mistake, or in response to newly discovered evidence. Rather, the vague and categorical statement in Hulsey's declaration does not even attempt to explain how it can be squared with Hulsey's deposition testimony acknowledging that he did, indeed, sign the master agreement and was given a copy of it to take home. Rather, it simply states a fact that clearly and unambiguously contradicts his prior testimony. In fact, it appears that the declaration submitted by Hulsey in connection with the motions presently before the Court is the same, verbatim, as the declarations that were submitted in opposition to Plaintiffs' Motion for Leave to Amend and Third-Party Defendants' Motion to Dismiss, both of which were filed before Hulsey was deposed, in January 2022. *See* dkt. nos. 23 (Hulsey declaration filed on September 21, 2020), 56-1 (Hulsey declaration filed on May 3, 2021).

Therefore, the requirements are met for finding that the statement in paragraph 10 of the Hulsey Declaration is a sham and the Court disregards it in deciding the parties' summary judgment motions. Based on the remaining evidence in the record, the Court finds that it is undisputed that Plaintiffs did not engage in fraud in the execution and therefore, that the Collective Bargaining Agreements are not void under that doctrine but are, instead, enforceable.[15]

#### 4. Whether the Collective Bargaining Agreements Are Enforceable Because HCI Adopted Them By its Conduct

Plaintiffs contend the Collective Bargaining Agreements are binding on HCI, as a matter of law, because the undisputed evidence establishes that HCI adopted the agreements by its conduct. Plaintiffs' Motion at 23. Defendants did not address this argument. The Court declines

---

[15] Defendants do not contend that the Collective Bargaining Agreements are unenforceable under a theory of fraudulent inducement, even though Hulsey's repeated assertions that he was told that Collective Bargaining Agreements would only require him to pay contributions for employees on the Airgas projects would appear to fall under that theory. In any event, the theory would fail under *Rozay's Transfer*, discussed above. Furthermore, it is well-established that "union agents have no duty to explain to employers the terms, conditions, or consequences of a collective bargaining agreement." *Emp. Painters' Tr. v. J & B Finishes*, 77 F.3d at 1192.

1    to grant summary judgment on this basis.

2            "The Ninth Circuit has recognized that a party who is not a signatory to a CBA 'can adopt

3    [a labor agreement] by their conduct.'" *Bd. of Trustees of Bay Area Roofers Health & Welfare Tr.*

4    *Fund v. Gudgel Yancey Roofing Inc.*, No. 16-CV-04310-LHK, 2017 WL 1065289, at *5 (N.D.

5    Cal. Mar. 21, 2017) (quoting *So. Cal. Painters & Allied Trade Dist. Council No. 36 v. Best*

6    *Interiors, Inc.*, 359 F.3d 1127, 1131–33 (9th Cir. 2004)). "To determine whether a party has

7    adopted a contract by its conduct, the relevant inquiry is whether the party has displayed 'conduct

8    manifesting an intention to abide by the terms of the agreement.'" *Best Interiors*, 359 F.3d at

9    1133) (quoting *NLRB v. Haberman Constr. Co.*, 641 F.2d 351, 356 (5th Cir.1981) (en banc)).

10   "Whether particular conduct in a given case demonstrates the existence or adoption of an

11   agreement is a question of fact." *Gudgel Yancey Roofing*, 2017 WL 1065289, at *5 (quoting *Arco*

12   *Elec. Co. v. NLRB*, 618 F.2d 698, 699 (10th Cir. 1980)).

13           "[C]ourts considering whether an employer has adopted a CBA by conduct 'have

14   emphasized, among other factors, the payment of union wages, the remission of union dues, the

15   payment of fringe benefit contributions, the existence of other agreements evidencing assent and

16   the submission of the employer to union jurisdiction, such as that created by grievance

17   procedures.'" *Bd. of Trustees of the Bay Area Roofers Health & Welfare Tr. Fund v. Gudgel*

18   *Yancey Roofing Inc.*, 225 F. Supp. 3d 1106, 1112 (N.D. Cal. 2016) (quoting *Bricklayers Local 21*

19   *of Ill. Apprenticeship & Training Program v. Banner Restoration, Inc.*, 385 F.3d 761, 766 (7th

20   Cir. 2004)).   This inquiry is fact intensive and requires the Court to engage in a detailed analysis

21   of the specific conduct at issue as it relates to the obligations imposed under the relevant

22   agreement or agreements.  *See Alaska Trowel Trades Pension Trust v. Rady Concrete Const.*,

23   LLC, 2016 WL 6518430 (D. Ala. Nov. 2, 2016) ("*Alaska Trowel*").  Thus, for example, in *Alaska*

24   *Trowel*, the court found, on summary judgment, that the defendant had adopted the collective

25   bargaining agreement as to its obligations to make contributions for certain projects, as to which it

26   had submitted signed contribution forms, but that there were factual disputes as to whether its

27   submission of *unsigned*  contribution forms for work on other projects meant it had adopted the

28   collective bargaining agreement as to those projects.  *Id.*  at *6-7.

United States District Court
Northern District of California

United States District Court
Northern District of California

Here, Plaintiffs assert that HCI adopted the Collective Bargaining Agreements generally because it "reported and paid contributions on behalf of some of its employees, held itself out as a union contractor so it could bid on jobs that required the use of union labor, affiliated with the Union so its employees learn new skills such as lead abatement, and took advantage of utilizing union labor that had the skills it needed on projects even where no union labor was required to be used." Motion at 23. Plaintiffs have, indeed, provided evidence that HCI understood that it had become a "union employer" and sometimes conducted itself as such. Defendants do not dispute that neither Hulsey nor Peddy objected when Roberts stated in a September 5, 2017 email on which both were copied that HCI had "never been signatory to any Union so everything [would] be new to them." Minser Supp. Decl., Ex. AE-2. Likewise, Defendants do not dispute that HCI had the Union dispatch labor to HCI projects, possibly including projects that were not covered by the MOA and that did not require union labor. *See* Minser Dec., Ex. AE (dispatches); *id.,* Ex. AA (Peddy Dep.) at 8-9, 11, 13-14,19, 22, 27-28 (testimony that HCI requested dispatches of union labor to projects that probably included Constellation Brands, Cambria Wineyards, and Ammonia Refrigeration, where union labor was not required). Nonetheless, the Court finds that the evidence Plaintiffs point to is not sufficient to establish *as a matter of law* that HCI adopted the Collective Bargaining Agreements in their entirety, given that it is unclear on the current record how extensive this conduct was and which projects it related to.

### 5. Whether the Agreement of Employers Gives Rise to Individual Liability as to Hulsey

While HCI is bound by the Collective Bargaining Agreements and the Trust Agreements for the reasons discussed above, the question of whether Hulsey is individually liable for fringe benefit contributions and other amounts due under those agreements turns on whether the Agreement of Employers is enforceable. Hulsey contends that the Agreement of Employers is unenforceable, as a matter of law, for four reasons: 1) Plaintiffs engaged in fraud connected with his execution of the Agreement of Employers; 2) the Agreement of Employers is unenforceable because it lacks consideration; 3) the Agreement of Employers violates California's Statute of Frauds because it was not signed in Mr. Hulsey's individual capacity; and 4) enforcement of the

Agreement of Employers as to Hulsey would be contrary to public policy.  The Court finds based on the undisputed facts in the record that the Agreement of Employers is binding as to Hulsey's individual liability but that under the plain terms of that agreement, Hulsey is individually liable only for unpaid contributions for the reasons discussed below.

a.   Fraud in the Execution

As discussed above, fraud in the execution occurs when the conduct or representations of the union leads the employer to reasonably believe that the document that it has signed is something "entirely different" from what it actually is.  *Rozay's Transfer*, 791 F.2d at 773.  Here, however, the undisputed evidence establishes that Hulsey *knew* he was signing a promise to make fringe benefit contributions, even if he misunderstood the scope of the promise.  In particular, Hulsey states in his declaration:

> Roberts on June 14, 2017 had me sign a post-card size "Agreement of Employers Regarding Bay Area Painters and Tapers Trust Funds" wherein HCI agreed to contribute to the trust funds, but Roberts assured Peddy and myself that this only applied to employees working the PGE/Airgas projects, and further paperwork would be drafted to identify those employees.

Hulsey Decl. ¶ 10.  This statement may be evidence of fraud in the inducement but as discussed above, that is not a defense to liability in an action for contributions under ERISA.

Furthermore, even if Hulsey did *not* know what he was signing when he signed the Agreement of Employers, as his deposition testimony suggests, the only evidence in the record is that this is because he failed to read the document.  There is no evidence in the record that he did not have a reasonable opportunity to read it at the time of signing.  As Hulsey points out, the document was "post-card" size and the title of the agreement was printed in all capital letters at the top; the sentence stating that the employer would be "personally and individually liable" for contributions is the last one in the agreement, just above the employer information and Hulsey's signature.  *See* Minser Decl. Ex. AB.  Nor is it "a defense to claim that a union representative misrepresented the effect of signing an agreement."  *Operating Engineers Pension Tr. v. Cecil Backhoe Serv., Inc.*, 795 F.2d 1501, 1505 (9th Cir. 1986) (citing *Bjorklund*, 728 F.2d at 1265-1266).  Rather, "[a] party who signs a contract is bound by its terms regardless of whether he reads

United States District Court
Northern District of California

1   it or considers the legal consequences of signing it." *Id.* (citing *Gilliam*, 737 F.2d at 1504).

2       Therefore, Hulsey has not pointed to any evidence that would give rise to a material issue

3   of fact – much less, establish as a matter of law – that the Agreement of Employers is void due to

4   fraud in the execution.

5           b.   Whether there is Consideration as to Agreement of Employers

6       Hulsey contends the Agreement of Employers cannot be enforced against him because it

7   "lacks any consideration, or even any recitation of consideration, to the individual purportedly

8   guaranteeing the debt."   Hulsey Motion at 9 (citing *Bliss v California Cooperative Producers*, 30

9   Cal. 2d 240, 248 (1947)).   Plaintiffs do not disagree that under California law, a contract must be

10  supported by "sufficient consideration."   Cal. Civ. Code §1550.   The facts relating to

11  consideration here are undisputed, however, and establish that the Agreement of Employers is

12  supported by consideration as to Hulsey as an individual.   In particular, the undisputed evidence

13  establishes that Hulsey is the sole owner of HCI and that he entered into the Collective Bargaining

14  Agreement in order to allow HCI to bid on PGE's Airgas projects.   Under these circumstances, the

15  benefits of entering into the Collective Bargaining Agreement -- allowing HCI to enter into

16  contracts to perform work for PGE that otherwise it could not have bid for -- accrued not only to

17  HCI but also to Hulsey as its sole owner.   These benefits are sufficient to establish consideration

18  in return for Hulsey's promise of individual liability under the Agreement of Employers. *See*

19  *Patek & Co. v. Vineberg*, 210 Cal. App. 2d 20, 23 (1962) (promise to guarantee company's debt

20  was supported by consideration where promisors owned all of the stock in the company and

21  guaranty allowed company to continue operating for several months). Therefore, the Court finds,

22  as a matter of law, that the Agreement of Employers establishes individual liability as to Hulsey.[16]

23

24  ---

[16] Plaintiffs anticipated that Defendants would argue that the provision in the Agreement of
25  Employers establishing individual liability should be treated as a guaranty and argue in their briefs
    that even if it is a guaranty, it is enforceable.  In fact, Defendants did not make this argument in
26  their briefs. The Court further notes that the Ninth Circuit has upheld similar personal liability
    provisions in the ERISA context and has not treated such promises as guaranties.  *See, e.g.*, *Emp.*
27  *Painters' Tr. v. J & B Finishes,* 77 F.3d at 1192 (holding that president of employer who signed
    collective bargaining agreement with personal liability provision was personally liable under
28  collective bargaining agreements).  Therefore, the undersigned concludes that it is not necessary to
    reach these arguments.

United States District Court
Northern District of California

c.   Whether the Agreement of Employers Violates the Statute of Frauds

Defendants contend the Agreement of Employers fails to comply with the statute of frauds because it was not signed by Hulsey in his individual capacity.  They do not cite to any case authority in support of this argument, which the Court finds unpersuasive.

Under California Civil Code section 1624, a promise to answer for the debt or default of another must be in writing unless it meets certain exceptions noted in California Civil Code section 2794.  Assuming the promise to be individually liable in the Agreement of Employers is a guarantee that is subject to this provision, there is no question that the writing requirement is met as the Agreement of Employers states that the signer will be held "personally and individually liable for said contributions."

Further, the fact that Hulsey signed "on behalf of" HCI does not relieve him of liability in the face of the clear language of the agreement stating that the individual signing on behalf of the employer would be individually liable.  *See Emp. Painters' Tr. Health & Welfare Fund v. Landon Const. Grp.,* No. C11-0068-JCC, 2011 WL 5864648, at *3 (W.D. Wash. Nov. 22, 2011) ("[W]here courts have considered whether to uphold personal liability provisions in collective bargaining agreements, the question of whether the officer at issue signed the contract has been a key consideration."); *Sebastian Int'l, Inc. v. Peck*, 195 Cal. App. 3d 803, 808 (1987) (rejecting argument by signatory of guaranty that he was not individually liable because he had signed as "vice president" and therefore was only signing in a representative capacity on the part of the company).

Therefore, the Court rejects Defendants' assertion that the Agreement of Employers is unenforceable, as a matter of law, under the statute of frauds.

d.   Whether Enforcement of the Agreement of Employers as to Hulsey Would be Contrary to Public Policy

Defendants argue that it would be contrary to public policy to hold Hulsey individually liable for the large amount of money that Plaintiffs seek in this case, relying heavily on *California Bank & Tr. v. DelPonti*, 232 Cal. App. 4th 162 (2014).  Defendants' Opposition at 9-11.  In that case, the court held that "a guarantor's waiver of defenses is limited to legal and statutory defenses

United States District Court
Northern District of California

expressly set out in the agreement [and] [a] waiver of statutory defenses is not deemed to waive all defenses, especially equitable defenses, such as unclean hands, where to enforce the guaranty would allow a lender to profit by its own fraudulent conduct."  232 Cal. App. 4th at 167. According to Defendants, *DelPonti* is "strikingly analogous to the instant case in that the fraud perpetrated on Mr. Hulsey by Mr. Roberts and the Union, and by extension the trust funds that are the third-party beneficiaries of any contract that was formed, involved repeated assurances by Mr. Roberts that the only payroll that would be taxed for Union contributions would be the Airgas/PGE payroll."  Defendants' Opposition at 12.

*DelPonti*, however, did not involve ERISA or a promise of individual liability under a collective bargaining agreement.  As discussed above, public policy considerations have led courts to conclude that "traditional contract law does not apply with full force in actions brought under . . . ERISA[ ] to collect delinquent trust fund contributions."  *Rozay's Transfer*, 791 F.2d at 773.   As Defendants' public policy argument is essentially a rehash of their argument that the Agreement of Employers is unenforceable based on fraud in the execution, the Court rejects Defendants' public policy argument for the same reasons it rejects Defendants' argument based on fraud.

e.   Scope of Individual Liability

While the Court concludes that Plaintiffs are entitled to summary judgment that Hulsey is individually liable under the Agreement of Employers for the reasons discussed above, this does not end the inquiry because the Court must also determine the scope of Hulsey's liability. Plaintiffs contend Hulsey is liable for not only the unpaid contributions but also all related amounts (*e.g.* liquidated damages, interest, attorneys' fees and costs).  The problem with this argument is that the plain language of the agreement simply states: "The individual whose signature appears below on behalf of the employer, agrees to be personally and individually liable for *said contributions*." Minser Decl., Ex. AB (Employer Agreement).  The word "said" certainly refers back to the Collective Bargaining Agreements referenced earlier in the Agreement of Employers, but it does not clearly incorporate all of the obligations of the employer under the Collective Bargaining Agreements, as Plaintiffs argued at the motion hearing.

The Court finds nothing in the Collective Bargaining Agreements that supports the broad

United States District Court
Northern District of California

1   interpretation of the individual liability provision advanced by Plaintiffs.  Moreover, the first

2   paragraph of the Agreement of Employers supports a contrary interpretation of that provision.  In

3   particular, that paragraph makes clear that the obligation to make "contributions" is a subset of the

4   employer's obligations under the Collective Bargaining Agreement, distinct from the other

5   remedies to which Plaintiffs are entitled, stating that "[t]he undersigned employer agrees to pay

6   the monthly contribution . . . *and* to be bound in all respects by the collective bargaining

7   agreement, and the Trust Agreements."  Minser Decl., Ex. AB (Agreement) of Employers

8   (emphasis added).

9         Plaintiffs also assert that other judges in this district have enforced the same provision and

10   found that it gave rise to personal liability on the part of the signatory as to all amounts due under

11   the collective bargaining agreement and not just unpaid contributions.  Plaintiffs' Opposition at 18

12   (citing *Bay Area Painters & Tapers Pension Trust Fund v. Scott*, Case No. C-10-2386 CW (EDL),

13   2010 U.S. Dist. LEXIS 162936 (N.D. Cal. 2010); *Bay Area Painters & Tapers Pension Trust

14   Fund v. Delta City Drywall*, Case No. C-10-1043 JSW (JL), 2011 U.S. Dist. LEXIS 172215 (N.D.

15   Cal. 2011); *Bay Area Painters & Tapers Pension Trust Fund v. Golden Vas Painting*, Case No. C-

16   10-2923 CW (DMR), 2011 U.S. Dist. LEXIS 141309 (N.D. Cal. 2011); *Dist. Council 16 N. Cal.

17   Health & Welfare Trust Fund v. Lidini Co*., Case No. C-17-5985 PJH (SK), 2019 U.S. Dist.

18   LEXIS 179383 (N.D. Cal. 2019)). As Plaintiffs conceded at oral argument, however, none of these

19   decisions offers any reasoning that justifies holding signatories individually liable as to remedies

20   other than unpaid contributions, or even addresses the specific language of the Agreement of

21   Employers on the question of individual liability.  Nor has the undersigned found any case that

22   addresses this question.

23         For the reasons discussed above, the undersigned respectfully declines to adopt the

24   approach taken by other judges in this district in enforcing the individual liability provision in the

25   Agreement of Employers.  Rather, the Court finds that in signing the Agreement of Employers,

26   Hulsey only promised to be individually liable for unpaid contributions under the Collective

27   Bargaining Agreements.

28

### C.   Whether Plaintiffs are Entitled to Summary Judgment on the Amounts they Seek in Unpaid Contribution and Related Amounts

Having found that Defendants are liable to Plaintiffs for their failure to comply with the Collective Bargaining Agreements, the Court must determine whether there are disputed material facts relating to the amounts Plaintiffs seek.  As noted above, Defendants did not challenge these amounts in their briefs or offer any evidence to controvert the amounts.  Nonetheless, the burden remains on Plaintiffs to show that the uncontroverted evidence they have offered is legally sufficient to support the amounts they seek, as a matter of law.

#### 1.   Audit Amounts Found Due Related to Unpaid Contributions for July 1, 2017 through August 31, 2019

Plaintiffs request that the Court award $2,204,296.77 for the amounts due in connection with the audit.   This amount includes: 1) $1,520,264.57 in contributions that the auditor found were under-reported; 2)  $304,052.91 in liquidated damages, calculated at a rate of 20%; 3) interest on the underpaid contributions through March 31, 2020 in the amount of $126,481.08, calculated at a rate of 5%; 4) interest for the period April 1, 2020 through June 15, 2023 in the amount of $243,872.46;  and 5)  audit examination costs in the amount of $9,625.75. Plaintiffs' Motion at 13-14.

There is no question that Plaintiffs are entitled to the full amount of the audit examination costs that they request. As discussed above, the Collective Bargaining Agreements, Trust Agreements and Collection Procedures all permit the Trust Funds to conduct audits to estimate unreported contributions and to determine whether the employers' contribution reports are accurate.  Further, the 2015 and 2020 Audit Procedures adopted by the Trust Funds provide that an employer is assessed full audit fees in the following circumstances: a) where net underpayments found on audit equal or exceed 10% of an employer's correct contributions for the audit period; b) where an employer fails to maintain records in accordance with the collective bargaining agreements causing surplus of work by the auditor; or c) where the employer intentionally or negligently omits, deletes, misclassifies or otherwise provides fraudulent reports or records. Christopherson Decl. ¶15 (citing Exhibit F (2020 Audit Procedures) Article II, §D(1); Ex. G (2015 Audit Procedures).

United States District Court
Northern District of California

Here, Plaintiffs have offered uncontroverted evidence that the Trust Funds audited HCI for the period July 1, 2017 through August 31, 2019 and that the auditor found that: 1) HCI maintained inadequate records; and 2) that HCI's contributions for this period were underreported by more than 10%. *See generally,* Hallenbeck Decl. & Ex. B (Audit Report).  Plaintiffs also provided evidence that the cost of the audit was $9,625.75 and Defendants have not pointed to any evidence that this amount incorrect.  Hallenbeck Decl. ¶ 15.  Therefore, Plaintiffs are entitled to $9,625.75 in audit examination costs, for which only HCI is liable.

Whether Plaintiffs are entitled to the remaining amounts connected with the audit depends on whether the undisputed evidence supports the contribution amount that the auditors found was underreported of $1,520,264.57.  Notably, this amount includes charges for work performed on non-covered projects because of HCI's "inadequate records."  Hallenbeck Decl. ¶ 13.  As Plaintiffs' counsel explains in his declaration, the Auditor alerted him to the problem in a January 24, 2020 communication informing him that "not all the documents requested in the Auditor's September 30, 2019 letter were submitted [to the Auditor] by [HCI]."  Minser Decl. ¶ 15.

The Auditor explained:

> Hulsey provided payroll and project information, but claims they do not maintain any timekeeping records necessary to identify which hours were worked on which project. This is an issue because Hulsey performs covered and non-covered work and has an approved list of red circle projects pursuant to an MOA. We attempted to separate employees in covered versus non-covered classifications; however, apparently Hulsey commingles covered and non-covered employees under the same workers compensation classifications.
>
> I've prepared the attached spreadsheet to illustrate this situation and compare the number of hours worked per payroll records to the number of hours reported to the DC16 Trusts, by classification, by year.
>
> On one hand, charging benefits on all unreported hours will be overstating the liability since they have non-covered projects; however, on the other hand, they've left no alternatives by not maintaining appropriate records.
>
> The result will be charges for over 92,000 hours. The Company's owner and accountant have been generally advised that we may have to charge for all hours, but we have not discussed the potential dollar amount.

*Id.* & Ex. AK.[17] According to Hallenbeck, the Trust Funds directed the Auditor to "quantify discrepancies for all unreported hours listed on the Company's payroll records and for all unreported non-union subcontractors."  Hallenbeck Decl. ¶ 13.

HCI did not come forward with any evidence or records challenging the audit results when it was initially sent the draft report or any time thereafter.  Minser Decl. ¶ 21; Hallenbeck Decl. ¶ 16.  Nor has it offered any evidence in opposition to Plaintiffs' Motion that would allow for a

---

[17] A more detailed explanation of the shortcomings with HCI's records is contained in the cover letter sent with the Audit Report, which states, in part:

The Company did not maintain signed timecards, as required by the collective bargaining agreement; therefore, we were unable to test the hours in the payroll registers by tracing them to source documents. In accordance with Trust provisions the Trustees have opted not to exercise the 40 hours presumption on this testing. The Company has been advised of the requirement to maintain signed timecards.

We noted employees were being paid a wage rate below the rate specified on the Wage and Fringe Schedule. This information is provided for the Local's review.

During our testing, the Company was unable to provided job cost reports, job hours, labor distribution and timecards or similar documents to determine the hours worked in District Council 16 jurisdiction, including the hours for Red Circle Agreement jobs; therefore, we quantified all hours on payroll except for office employees as directed by Local 294 and the Trust Fund Office. The Company has been advised of the situation.

We also were unable to determine which employees completed work in District Council 16 jurisdiction as the Company had two workers' compensation job classifications and all employees were listed under both job classifications. The employees that were never reported to the Trust are classified on the attached report as an "Unknown Journeyman" and quantified at the Journeyman fringe rate.

Non-signatory subcontractor or individual performed work covered by the collective bargaining agreement but was not reported to the Trust. The number of hours listed was estimated by dividing total invoices dollar amounts by  Journeyman wage rate.

The following types of discrepancies were noted:

1. Employee worked more hours during the month than the number of hours reported to the Trust.
2. Employee worked fewer hours during the month than the number of hours reported to the Trust.
3. Employee was reported to the Trust at a rate other than the rate specified by the Wage and Fringe Schedule. The amount listed represents the difference between the two rates.
4. Non-signatory subcontractor or individual performed work covered by the collective bargaining agreement but was not reported to the Trust.
5. Employee hours were submitted to Trust without payment.

Hallenbeck Decl., Ex.B (Audit Report cover letter).

United States District Court
Northern District of California

more accurate determination of the amount of contributions owed for HCI employees who performed covered work during the period covered by the audit.  Indeed, it appears to be undisputed that HCI's records were not maintained in a manner that would allow for such a determination.

Where, as here, undisputed evidence establishes "the fact of damage and [the employer's] failure to keep adequate records, the burden shift[s] to [the employer] to come forward with evidence of the extent of covered work performed" by its employees.  *Brick Masons Pension Tr. v. Indus. Fence & Supply, Inc*., 839 F.2d 1333, 1338–39 (9th Cir. 1988). Further, where the employer "violate[s] its statutory duty under ERISA to keep accurate records and fail[s] otherwise to come forward with any evidence of the extent of covered work performed by [its employees], the Trust Funds are entitled as a matter of law to recover contributions for all hours worked by [its employees] during the quarter in which they were shown to have performed some covered work for [the employer]."  *Id.* Thus, because Defendants have not come forward with any evidence that would allow for a more accurate determination of the amount of covered work performed by HCI's employees during the audit period, Plaintiffs are entitled to the full amount of underpaid contributions set forth in the Audit Report. Both Defendants are liable for this amount.

The Court also finds that the liquidated damages and interest sought on these amounts is consistent with the Collective Bargaining Agreements and Trust Agreements and therefore, the Court awards these amounts in full, for which only HCI is liable.

### 2.  Amounts Related to Unpaid Contribution Reported for November 2018

Plaintiffs seek $34,160.10 for the November contribution that was reported but not paid and related amounts (including $24,006.06 for the unpaid contributions, $4,801.21 in liquidated damages at a rate of 20% and $5,352.83 in interest at 5% for the period January 1, 2019 through June 15, 2023).  Plaintiffs' Motion at 13-14.  They have provided evidence in the form of a declaration of counsel that "[o]n or about February 6, 2020, [counsel] was informed by the Plaintiff Trust Funds' Administrator, Health Services & Benefit Administrators, Inc. ("HS&BA") that Hulsey Contracting had failed to submit its contributions for November 2018 in the reported amount of $24,006.06."  Minser Decl. ¶ 16.  Plaintiffs have also provided the contribution report

1   for November 2018 reflecting an amount due of $24,006.06. Dkt. no. 110-4 at ECF pp. 117-119.

2       At oral argument, Plaintiffs stipulated that the amounts due for November 2018 were also

3   covered in the audit, discussed above, and that the amounts that the auditors determined were due

4   for that month are higher than the self-reported amounts.  They also conceded that awarding both

5   the self-reported amount and the amount found due by the auditors would amount to double-

6   counting.  Therefore, the Court declines to award the self-reported amount for November 2018

7   because the audit amount already includes the amount Plaintiffs' auditors found was actually due

8   for that month.

9

### 3.  Estimated Amounts for Unreported Contributions for September 2019 through June 2020

10

11      Plaintiffs seek $258,674.84 for unreported contributions and related amounts for the

12   months of September 2019 through June 2020 (including $189,860.60 in estimated unpaid

13   contributions, $37,972.12 in liquidated damages at a rate of 20% and $30,842.12 in interest at a

14   rate of 5% from the date each payment became delinquent through June 15, 2023).  Plaintiffs'

15   Motion at 13-14; Minser Decl. ¶ 60.  The amount of contributions sought for these months is an

16   estimate obtained by taking an average of the last three (3) months reported, as is permitted by the

17   2015 and 2020 Collection Procedures, discussed above.  Minser Decl. ¶ 48.  In particular,

18   according to Plaintiffs, the last report submitted by HCI was in December 2018 and it reported

19   $2,664.00 in contributions; HCI reported $24,006.06 for November 2018 and $30,288.11 for

20   October 2018, giving rise to an average monthly contribution amount of $18,986.06 for each of

21   the months in this period.  Dkt. no. 110-4 at ECF pp. 117-119.

22   *Id.*

23      The Court finds that this approach is consistent with the Collective Bargaining

24   Agreements, Trust Agreements and Collection Policies, as are Plaintiffs' calculations of liquidated

25   damages and interest.  Therefore, this amount is awarded in full.  Both Defendants are liable for

26   the unpaid contributions.  HCI alone is liable for the remaining amounts.

27   ### 4.  Attorneys' Fees and Costs

28      As discussed above, the Collective Bargaining Agreements and Trust Agreements provide

United States District Court
Northern District of California

for reimbursement of attorneys' fees and any other expenses, including costs and audit fees, incurred in connection with the collection of delinquent contributions.  Moreover, under ERISA, Plaintiffs who prevail in an action for delinquent contributions are entitled to an award of reasonable attorneys' fees and costs. 29 U.S.C. § 1132(g)(2)(D).  Federal courts have adopted the "lodestar" method for calculating the amount of reasonable attorneys' fees. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The lodestar figure is the product of the hours counsel reasonably spent on the case and a reasonable hourly rate. *Id*.  Here, Plaintiffs seek a lodestar amount of $72,458.50 in attorneys' fees for 251.1 attorney hours and 46.3 paralegal hours billed by Plaintiffs' counsel, the firm of Saltzman & Johnson.  Minser Decl. ¶ 65.  Plaintiffs have supplied a description of each timekeeper's qualifications and summaries of the work they performed on this case. Minser Decl. ¶¶ 63-64 & Exs. AH, AI.  Defendants have not challenged the hourly rates Plaintiffs request or the hours billed by Plaintiffs' counsel in this action.

This Court is well familiar with the work of the Saltzman & Johnson firm and the hourly rates that it charges for the work of its attorneys and paralegals.  Having reviewed Plaintiffs' submissions in support of their fee request, the Court finds the rates requested in this case are reasonable and in line with rates awarded in this District for similar work by attorneys with comparable qualifications. *See Welch v. Metro. Life Ins. Co*., 480 F.3d 942, 946 (9th Cir. 2007) (holding that reasonableness is determined based on the prevailing market rate for similar work by similarly qualified counsel).  The Court also finds the time billed to be reasonable.  The Court notes that the relatively high number of hours billed in this case is due, at least in part, to Defendants' own litigation choices, including refusing to stipulate to the filing of an amended complaint to add Hulsey as a defendant, thus necessitating a motion be brought by Plaintiffs to resolve that issue.

Plaintiffs also seek an award of $10,027.18 in costs incurred between April 9, 2019 and May 31, 2023.  Minser Decl. ¶ 66 & Exs. AH, AJ.  This amount is comprised of the Complaint filing fee, Service of the Summons and Complaint, Lexis legal research, court reporting and transcript costs for depositions, and mediation fees. Defendants do not challenge the costs sought by Plaintiffs, which the Court finds to be reasonable.

Accordingly, the Court finds that there are no disputed facts as to fees and costs sought by Plaintiffs, which the Court awards in full.   For the reasons stated above, only HCI is liable for these fees and costs.

## IV.     CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiffs' Motion, DENIES the Hulsey Motion and awards Plaintiffs damages in the amount of $2,545,457.29.  Of that amount, HCI and Hulsey are jointly and severally liable for $1,710,125.17.  HCI alone is liable for the balance. This resolves all of the issues in the case.  Therefore, the Clerk is instructed to enter judgment consistent with this Order and close the case.

**IT IS SO ORDERED.**

Dated: November 13, 2023

_____
JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
Northern District of California

40